PP:SP/VC
F. #2023R00389

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

Docket No. 23-CR-278 (S-2) (NRM)

ABU CHOWDHURY,
IFFAT LUBNA and
SULTANA RAZIA,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE GOVERNMENT'S MEMORANDUM OF LAW IN
RESPONSE TO DEFENDANTS' PRETRIAL MOTIONS

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Stephanie Pak
Vincent Chiappini
Assistant U.S. Attorneys
(Of Counsel)

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

PRELIMINARY STATEMENT ........ 1

BACKGROUND ........ 1

I. The Kidnappings ........ 1

II. Procedural History ........ 3

III. The Seizure of Chowdhury's Phones and the Granted Search Warrants ........ 3

A. The Car Stop ........ 4

B. The Search Warrant Applications ........ 5

IV. Lubna's Arrest and Post-*Miranda* Statement ........ 7

ARGUMENT ........ 8

I. Lubna's Post-Arrest Statement Is Admissible ........ 8

A. Legal Standard ........ 9

B. Lubna Has Not Established a *Miranda* Violation ........ 10

C. There Are No Material Facts in Dispute Regarding Lubna's Post-*Miranda* Statement ........ 16

II. Lubna's Motion for a Bill of Particulars Should Be Denied ........ 18

A. Legal Standard ........ 19

B. Lubna Has Not Established Her Need for a Bill of Particulars ........ 21

III. John Doe-1's and John Doe-2's Eyewitness Identifications Were Proper ........ 25

A. Legal Standard ........ 25

B. The Photo Arrays Were Not Unduly Suggestive ........ 28

C. The Identifications Were Independently Reliable ........ 35

IV. Chowdhury's Phones Were Lawfully Seized ........ 39

A. Chowdhury Does Not Challenge the Traffic Stop or His Arrest ........ 39

B. Police Were Authorized to Seize the Blue Phone from Chowdhury's Person During a Lawful Arrest ........ 40

C. The Seizure of the Red Phone Was Proper ........ 45

V. Law Enforcement Timely Obtained a Search Warrant ........ 57

A. Legal Standard ........ 57

B. Nine Days Is a Reasonable Period of Time to Obtain a Search Warrant ........ 58

VI. The Government Did Not Exceed the Scope of the Blue Phone Search Warrant ........ 62

A. Legal Standard ........ 62

B. Law Enforcement Discovered Evidence of John Doe-1's Kidnapping in Plain View ........ 63

VII. There Is No Basis to Suppress Evidence from Chowdhury's Phones .......................... 64

A. Legal Standard ........................................................................................................ 65

B. There Is No Evidence of Police Misconduct ............................................................. 65

VIII. An Evidentiary Hearing Is Unnecessary As to Both Defendants Because There Are No Material Issues of Fact in Dispute ..................................................................................... 67

IX. Razia's Motion for *Brady* Disclosures Should Be Denied .......................................... 68

A. Applicable Law ......................................................................................................... 68

B. The Government Has No Obligation to Produce Items Not In Its Possession ............ 69

# TABLE OF AUTHORITIES

Cases

Adeleke v. Johnson,
No. 20-CV-5224 (MKB), 2022 WL 4226042 (E.D.N.Y. Sept. 13, 2022) .................. 51, 57, 59
Arizona v. Gant,
556 U.S. 332 (2009)........................................................................................ 42
Berkemer v. McCarty,
468 U.S. 420 (1984)........................................................................................ 10
Bradley v. Meachum,
918 F.2d 338 (2d Cir. 1990) ........................................................................ 14, 15
Brady v. Maryland,
373 U.S. 83 (1963).......................................................................................... 1
Brigham City v. Stuart,
547 U.S. 398 (2006)........................................................................................ 55
Brisco v. Ercole,
565 F.3d 80 (2d Cir. 2009) .............................................................................. 26
Bryant v. Vill. of Greenwood Lake,
No. 11-CV-7788, 2013 WL 5952610 (S.D.N.Y. 2013) ........................................ 55
Colorado v. Bertine,
479 U.S. 367 (1987)........................................................................................ 46
Colorado v. Connelly,
479 U.S. 157 (1986)........................................................................................ 9
Davis v. United States,
512 U.S. 452 (1994)........................................................................................ 12
Dickerson v. United States,
530 U.S. 428 (2000)........................................................................................ 10
In re Terrorist Bombings of U.S.Embassies in East Africa,,
552 F.3d 157, 165 (2d Cir. 2008) .................................................................. 16, 64
Giglio v. United States,
405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).......................................... 69
Green v. Scully,
850 F.2d 894 (2d Cir. 1988) .......................................................................... 9, 10
Hamling v. United States,
418 U.S. 87 (1974).......................................................................................... 19
Haynes v. Washington,
373 U.S. 503 (1963)........................................................................................ 9
Herman v. City of New York,
No. 15-CV-3059 (PKC), 2022 WL 900592 n.14.................................................. 49
Illinois v. Lafayette,
462 U.S. 640 (1983)...................................................................................... 48, 52
J.D.B. v. N. Carolina,
564 U.S. 261 (2011)........................................................................................ 9

Jarrett v. Headley,
802 F.2d 34 (2d Cir. 1986) .......... 27, 31, 34
Jimenez v. City of Cohoes Police Dep't,
No. 23-955, 2024 WL 1551149 (2d Cir. Apr. 10, 2024) .......... 50
Kentucky v. King,
563 U.S. 452 (2011) .......... 62
Lynumn v. Illinois,
372 U.S. 528 (1963) .......... 10
Marquez v. Barrone,
No. 22-2855, 2024 WL 2828468 (2d Cir. June 4, 2024) .......... 29
McNeil v. Wisconsin,
501 U.S. 171 (1991) .......... 9
Moran v. Burbine,
475 U.S. 412 (1986) .......... 9, 11
Morgan v. Salamack,
735 F.2d 354 (2d Cir. 1984) .......... 70
Neil v. Biggers,
409 U.S. 188 (1972) .......... 27
Nix v. Williams,
467 U.S. 431 (1984) .......... 66
Oregon v. Elstad,
470 U.S. 298 (1985) .......... 9, 10
People v. Robinson,
36 A.D.2d 375 (2d Dep't 1971) .......... 47
People v. Shepley,
185 A.D.2d 862 (2d Dep't 1992) .......... 47
People v. Turner,
91 A.D.2d 646 (2d Dep't 1982) .......... 47
People v. Walker,
980 N.E.2d 937 (N.Y. 2012) .......... 47, 52
Perry v. New Hampshire,
565 U.S. 228 (2012) .......... 25
Ragunauth v. Ercole,
No. 07-CV-1692 (NG), 2008 WL 5401586 (E.D.N.Y. December 23, 2008) .......... 32
Raheem v. Kelly,
257 F.3d 122 (2d Cir. 2001) .......... 36
Riley v. California,
573 U.S. 373 (2014) .......... 40, 42
Schneckloth v. Bustamonte,
412 U.S. 218 (1973) .......... 10
Shipley v. California,
395 U.S. 818 (1969) .......... 40
Simmons v. United States,
390 U.S. 377 (1968) .......... 26
South Dakota v. Opperman,
428 U.S. 364 (1976) .......... 45, 48

Williams v. United States,
No. 12-CR-726 (KMK), 2020 WL 1847966 (S.D.N.Y. Apr. 13, 2020) ............................ 45, 51
Velazquez v. Poole,
614 F. Supp. 2d 284 (E.D.N.Y. 2007) ........................................................................ 26
United States v. Aliperti,
867 F. Supp. 142 (E.D.N.Y. 1994) ............................................................................ 25
United States v. Archibald,
734 F.2d 938 (2d Cir. 1984) ............................................................................ 31, 33, 34
United States v. Ashburn,
76 F. Supp. 3d 401 (E.D.N.Y. 2014) ................................................................... 17, 18
United States v. Barret,
824 F. Supp. 2d 419 (E.D.N.Y. 2011) ........................................................................ 69
United States v. Barrett,
No. 23-CR-623 (JLR), 2025 WL 371084 (S.D.N.Y. Feb. 3, 2025) .................................. 62, 64
United States v. Bautista,
23 F.3d 726 (2d Cir. 1994) .............................................................................. 32, 33
United States v. Berghuis,
560 U.S. 370 (2010)................................................................................................ 12
United States v. Bortnovsky,
820 F.2d 572 (2d Cir. 1987) .................................................................................. 19
United States v. Bracy,
No. 20-CR-483 (ARR), 2022 WL 17801133 (Dec. 19, 2022) ........................................... 30
United States v. Bradley,
105 F.4th 26 (2d Cir. 2024) .................................................................................... 70
United States v. Cancel,
167 F. Supp. 3d 584 (S.D.N.Y. 2016) ................................................................. 53, 56
United States v. Canniff,
521 F.2d 565 (2d Cir. 1975) .................................................................................. 70
United States v. Carroll,
510 F.2d 507 (2d Cir. 1975) .................................................................................. 25
United States v. Chandler,
164 F. Supp. 3d 368 (E.D.N.Y. 2016) ................................................................. 17, 68
United States v. Colello,
No. 20-CR-613 (JSR), 2024 WL 3429464 (S.D.N.Y. July 15, 2024)...................................... 70
United States v. Concepcion,
983 F.2d 369 (2d Cir. 1992) ................................................................... 26, 27, 28, 34
United States v. Coppa,
267 F.3d 132 (2d Cir. 2001) ............................................................................ 68, 69
United States v. Corbett,
No. 20-CR-213 (KAM), 2021 WL 4480626 (E.D.N.Y. Sept. 30, 2021) ........................... 40, 57
United States v. Crews,
No. 13-CR-835 (VB), 2015 WL 5474185 (S.D.N.Y. June 8, 2015) .......................................... 9
United States v. Crutchfield,
2023 WL 3317992 & n.1 (D. Minn. May 9, 2023) ........................................................... 44
United States v. Crutchfield,
No. 22-CR-269, 2023 WL 3868710 (D. Minn. Mar. 21, 2023) ............................................. 44

United States v. Dass,
849 F.2d 414 (9th Cir. 1988) .......... 60
United States v. Eisenberg,
707 F. Supp. 3d 406 (S.D.N.Y. 2023) .......... 54, 66
United States v. Eng,
997 F.2d 987 (2d Cir. 1993) .......... 47
United States v. Fabian,
No. 16-CR-131 (DLI), 2019 WL 3578226 (E.D.N.Y. Aug. 8, 2019) .......... 46, 54, 56, 57
United States v. Fayton,
697 F. Supp. 3d, 179 (S.D.N.Y. 2023) .......... 55
United States v. Franco,
No. 23-CR-394 (DG) Tr. of Crim. Cause for Status Conf. (E.D.N.Y. Oct. 15, 2024) .......... 59
United States v. Fruchter,
104 F. Supp. 2d 289 (S.D.N.Y. 2000) .......... 19, 20
United States v. GAF Corp.,
928 F.2d 1253 (2d Cir. 1991) .......... 21
United States v. Gamble,
388 F.3d 74 (2d Cir.2004) .......... 62, 63
United States v. Getto,
729 F.3d 221 (2d Cir. 2013) .......... 67
United States v. Gillette,
383 F.2d 843 (2d Cir. 1967) .......... 17
United States v. Green,
No. 1:18-CR-121 RJA(MJR), 2021 WL 1877236 (W.D.N.Y. Feb. 3, 2021) .......... 61
United States v. Hamideh,
No. 00 CR 950 (NRB), 2001 WL 11071 (S.D.N.Y. Jan. 3, 2001) .......... 27, 28
United States v. Handler,
No. 23 Crim 4 (JHR), 2023 WL 2584217 (S.D.N.Y. Mar. 21, 2023) .......... 40
United States v. Harris,
636 F. Supp. 3d 319 (E.D.N.Y. 2022) .......... 56
United States v. Hassan,
No. 18-CR-603 (ARR), 2019 WL 5684367 (E.D.N.Y. Nov. 1, 2019) .......... 67
United States v. Helbrans,
547 F. Supp. 3d 409 (E.D.N.Y. 2021) .......... 21, 25
United States v. Henderson,
439 F. App'x 56 (2d Cir. 2011) .......... 50
United States v. Herron,
18 F. Supp. 3d 214 (E.D.N.Y. 2014) .......... 43, 44
United States v. Hiya,
No. 24-CR-282 (VM), 2024 WL 5004586 (S.D.N.Y. Dec. 6, 2024) .......... 59
United States v. Ianniello,
621 F. Supp. 1455 (S.D.N.Y. 1985) .......... 21
United States v. Jacobwitz,
877 F.2d 162 (2d Cir. 1989) .......... 26
United States v. Jaswal,
47 F.3d 539 (2d Cir. 1995) .......... 9, 11

United States v. Johnston,
No. 23-CR-13 (NRM), Tr. of Tel. Conf. (E.D.N.Y. Nov. 1, 2024) .................................. 20, 22
United States v. Kamaldoss,
No. 19-CR-543 (ARR), 2022 WL 1200776 (E.D.N.Y. Apr. 22, 2022) .................................. 59
United States v. Lee,
600 F. App'x 8 (2d. Cir. 2016) .................................. 28, 35
United States v. Leonardi,
623 F.2d 746 (2d Cir. 1980) .................................. 27
United States v. Levy,
No. 04-CR-559 (NGG), 2005 WL 2179650 (E.D.N.Y. Sept. 9, 2005) .................................. 26, 27
United States v. Lopez,
547 F.3d 364 (2d Cir. 2008) .................................. 46, 48, 54, 55
United States v. Lucas,
No. 2019-3937-CR, 2021 WL 3700944 n.1 (2d Cir. Aug. 20, 2021) .................................. 55
United States v. Luguis,
166 F. Supp. 2d 776 (S.D.N.Y. 2001) .................................. 31, 33, 34
United States v. Lyle,
919 F.3d 716 (2d Cir. 2019) .................................. 45, 47, 52
United States v. Maldonado-Rivera,
922 F.2d 934 (2d Cir. 1990) .................................. 25, 27, 35
United States v. Maneti,
781 F. Supp. 169 (W.D.N.Y. 1991) .................................. 21
United States v. Marsh,
655 F. App'x 5 (2d Cir. 2016) .................................. 28
United States v. Martin,
157 F.3d 46 (2d Cir. 1998) .................................. 58, 59, 60
United States v. Mathurin,
148 F.3d 68 (2d Cir. 1998) .................................. 17
United States v. Mendez,
315 F.3d 132 (2d Cir. 2002) .................................. 46, 56
United States v. Meregildo,
2012 WL 4378047 (S.D.N.Y. 2012) .................................. 40
United States v. Moore,
670 F.3d 222 (2d Cir. 2012) .................................. 10
United States v. Morel,
No. 09-CR-493 (KAM), 2010 WL 2545479 (E.D.N.Y. June 18, 2010) .................................. 16
United States v. Morgan,
690 F. Supp. 2d 274 (S.D.N.Y. 2010) .................................. 28
United States v. Mundy,
806 F. Supp. 373 (E.D.N.Y. 1992) .................................. 46
United States v. Panza,
750 F.2d 1141 (2d Cir. 1984) .................................. 20
United States v. Persico,
No. 92 CR 351 (CPS), 1994 WL 3667 .................................. 28
United States v. Pimentel,
No. 99-CR-1104 (SJ), 2001 WL 185053 (E.D.N.Y. Jan. 22, 2001) .................................. 20

United States v. Raniere,
No. 18-CR-204-1 (NGG), 2019 WL 1984026 (E.D.N.Y May 3, 2019) ............................ 62, 63
United States v. Ray,
537 F. Supp. 3d 569 (S.D.N.Y. 2021) ............................................................................... 12
United States v. Restrepo,
No. 01-CR-1113 (SAS), 2002 WL 10455 (S.D.N.Y. Jan. 3, 2002) .................................. 31, 34
United States v. Rivera,
700 F. Supp. 3d 60 (S.D.N.Y. 2023) ................................................................................. 43
United States v. Rivera,
No. 09-CR-619 (SJF), 2011 WL 1429125 (E.D.N.Y. Apr. 13, 2011).................................... 20
United States v. Robinson,
414 U.S. 1973 .................................................................................................................. 40
United States v. Rodriguez,
496 F.3d 221 (2d Cir. 2007) .............................................................................................. 69
United States v. Ross,
No. 21-CR-571 (BMC) (LB), 2023 WL 6160436 (E.D.N.Y. July 31, 2023),
report and recommendation adopted, No. 21-CR-571 (BMC), 2023 WL 6158840
(E.D.N.Y. Sept. 21, 2023) ................................................................................................. 13
United States v. Ruggiero,
824 F. Supp. 379 (S.D.N.Y. 1993) ............................................................................... 47, 61
United States v. Sattar,
314 F. Supp. 2d 279 (S.D.N.Y. 2004) .......................................................................... 20, 23
United States v. Schaffer,
No. 12-CR-430 (ARR), 2014 WL 1515799 (E.D.N.Y. Apr. 18, 2014) .................................. 29
United States v. Scopo,
19 F.3d 777 (2d Cir. 1994) ................................................................................................ 40
United States v. Shkreli,
No. 15-CR-637, 2016 WL 8711065 ............................................................................... 19, 20
United States v. Shteyman,
No. 10-CR-347 (SJ), 2011 WL 2006291 (E.D.N.Y. May 23, 2011)................................ 20, 23
United States v. Singletary,
685 F. App'x 33 (2d Cir. 2017) .......................................................................................... 69
United States v. Smith,
967 F.3d 198 (2d Cir. 2020) .............................................................................................. 57
United States v. Sobers,
No. 17-CR-681 (ILG), 2018 WL 1936123 (E.D.N.Y. Apr. 24, 2018)..................................... 50
United States v. Spencer,
No. 06-CR-413 (DLI), 2016 WL 6781225 (E.D.N.Y. Nov. 15, 2016) .................................. 17
United States v. Taylor,
745 F.3d 15 (2d Cir. 2014) ................................................................................................ 10
United States v. Thai,
29 F.3d 784 (2d Cir. 1994) ................................................................................................ 32
United States v. Thompson,
29 F.3d 62 (2d Cir. 1994) .................................................................................................. 40
United States v. Torres,
901 F.2d 205 (2d Cir. 1990) .............................................................................................. 19

United States v. Townsend,
No. 15-CR-653 (DLI), 2016 WL 3562055 (E.D.N.Y. June 23, 2016) ..... 17
United States v. Tramunti,
513 F.2d 1087 (2d Cir. 1975) ..... 25
United States v. Trippe,
171 F. Supp. 2d 230 (S.D.N.Y. 2001) ..... 20
United States v. Uccio,
No. 88-CR-906 (MBM), 1989 WL 63111 (S.D.N.Y. June 8, 1989) ..... 31
United States v. Urso,
369 F. Supp. 2d 254 (E.D.N.Y. 2005) ..... 23
United States v. Waldrip,
No. 4:18-CR-163, 2019 WL 13143479 (S.D. Iowa Apr. 3, 2019) ..... 44, 60
United States v. Wallace,
2016 WL 4367961 (S.D.N.Y. August 11, 2016) ..... 55
United States v. Walsh,
194 F.3d 37 (2d Cir. 1999) ..... 21
United States v. Washington,
No. 05-CR-558 NG, 2006 WL 3359060 (E.D.N.Y. Nov. 17, 2006) ..... 26, 27
United States v. Watson,
No. 23-CR-82 (EK), 2023 WL 7300618 (E.D.N.Y. Nov. 6, 2023) ..... 59, 66
United States v. Wells,
No. 20-CR-633 (NRB), 2023 WL 2223474 (S.D.N.Y. Feb. 23, 2023) ..... 59, 60, 61
United States v. Whitehorn,
829 F.2d 1224 (2d Cir. 1987) ..... 66
United States v. Williams,
681 F.3d 35 (2d Cir. 2012) ..... 10
United States v. Williams,
930 F.3d 44 (2d Cir. 2019) ..... 46, 55
United States v. Wilson,
567 F. Supp. 3d 398 (W.D.N.Y. 2021) ..... 13
United States v. Yannotti,
541 F.3d 112 (2d Cir. 2008) ..... 19
United States v. Zamora,
42 F. Supp. 3d 397 (N.D.N.Y. 2014) ..... 16
United States v. Zimmerman,
480 F. Supp. 3d 446 (E.D.N.Y. 2020) ..... 49, 54

Statutes

18 U.S.C. § 1201(a)(1) ..... 3, 4, 5, 6
18 U.S.C. § 3500 ..... 69
18 U.S.C. §§ 371 ..... 5, 6

Rules

Fed. R. Crim. P. 7(f) .......... 19
Fed. R. Crim. P. 16(a)(1)(E) .......... 70
Federal Rule of Criminal Procedure 7(c) .......... 19
Federal Rule of Criminal Procedure 16 .......... 70

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum in opposition to the following defense motions:

- Defendant Lubna's motion to suppress her post-arrest statements, see ECF No. 285 ("Lubna Mot.");
- Defendant Lubna's motion for a bill of particulars, see ECF No. 285; and
- Defendant Abu Chowdhury's motion to suppress the photo array identifications of John Doe-1 and John Doe-2 and materials seized from two of his cell phones, see ECF No. 280 ("Chowdhury Mot.");[1]
- Defendant Razia's motion compelling the government to make certain immediate disclosures she believes constitute material qualifying under Brady v. Maryland, 373 U.S. 83 (1963), see ECF No. 282 ("Razia Mot.").

As set forth below, the defendants' motions should be denied in their entirety without a hearing. None of the defendants' arguments are meritorious, and none of the defendants alleges a material fact at issue that bears on suppression.

## BACKGROUND

### I. The Kidnappings

The Second Superseding Indictment charges three kidnappings that occurred on March 27, 2023, of John Doe-1 (Counts One and Two); May 11, 2023, of John Doe-2 (Counts Three and Four); and May 10, 2023, of John Doe-3 (Counts Five and Six). Defendants Abu Chowdhury, Ruhel Choudhury, Shahed Alom, Syed Rubel Ahmed, Anzu Khan and Sultana Razia are charged in Counts One and Two; defendants Abu Chowdhury, Ruhel Choudhury, and

[1] The Chowdhury Mot. erroneously identifies John Doe-3 as having participated in a photo array administered on or about May 22, 2023. John Doe-2 participated in that aforementioned photo array.

Iffat Lubna are charged in Counts Three and Four; and defendants Abu Chowdhury, Ruhel Choudhury, Lubna, and Shaidhual Chowdhury are charged in Counts Five and Six.

In each of these kidnappings, Abu Chowdhury ("Chowdhury"[2]) kidnapped a victim and held him captive in a car so that he and his co-conspirators could beat, humiliate, and hold the victim against his will for hours or even days. The victims shared several similarities: they were all men from Bangladesh, who lacked U.S. citizenship, had little to no family members or friends in the United States, spoke little to no English, and were smaller in build than Chowdhury. In each case, Chowdhury had decided that these victims slighted him or his reputation in some way and sought retribution: John Doe-1 had taunted Chowdhury on social media; John Doe-2 had apparently become too friendly with Lubna, Chowdhury's now wife; and John Doe-3 had stated that Lubna had a scandalous social life in college. To punish these perceived challenges to his reputation, Chowdhury kidnapped each of these victims. During these kidnappings, Chowdhury contacted his co-defendants using his cell phone to meet him at various locations in Queens where they terrorized the victims by threatening them and beating them relentlessly with weapons and their fists. Lubna actively participated in the kidnappings of John Doe-2 and John Doe-3 alongside Chowdhury. She punched and threatened to kill John Doe-3. She also took John Doe-2's cell phone and struck him when he was whisked off the street and forced into the car in which she and Chowdhury were traveling.

In addition to the mental trauma of their captivity, each victim also suffered serious physical injuries. John Doe-1's face and ears were swollen and bruised from the beatings he

[2] There are two defendants in this case with the last name Chowdhury. Shaidhual Chowdhury has entered a guilty plea (ECF Minute Entry dated May 28, 2025) and has not filed any pretrial motions. This memorandum of law responds to the motion of Abu Chowdhury. Unless otherwise noted, all references to "Chowdhury" refer to Abu Chowdhury.

suffered at the hands of Chowdhury and his co-defendants. John Doe-2 was hospitalized for rectal tears from being sodomized and bruises around his face and body from the blows Chowdhury and Lubna inflicted. John Doe-3 endured bruising and cuts on his hands and limbs as a result of his kidnappers' assaults during the kidnapping.

## II. Procedural History

On July 7, 2023, a grand jury sitting in this district returned an indictment against Chowdhury and Lubna charging them with the kidnapping of John Doe-2, in violation of 18 U.S.C. § 1201(a)(1). See ECF No. 1. On January 9, 2024, a grand jury returned a superseding indictment additionally charging Chowdhury, Ruhel Choudhury, Ahmed, Alom, Khan and Razia with the kidnapping of and conspiracy to kidnap John Doe-1, in violation of 18 U.S.C. § 1201(a)(1) and (c), respectively. See ECF No. 55. On December 16, 2024, a grand jury returned a second superseding indictment, charging Abu Chowdhury, Lubna and Shaidhual Chowdhury with the kidnapping of and conspiracy to kidnap John Doe-3, in violation of 18 U.S.C. § 1201(a)(1) and (c), respectively. See ECF No. 200.

## III. The Seizure of Chowdhury's Phones and the Granted Search Warrants

Law enforcement seized two cell phones from Chowdhury on May 31, 2023, in Queens during his arrest for aggravated unlicensed operation of a motor vehicle in the third degree and failure to obey a traffic device. Nine days later, the government obtained a search warrant authorizing a limited search of the two cell phones for evidence pertaining to John Doe-2's kidnapping. After discovering evidence in plain view regarding John Doe-1's kidnapping on one of the phones, the government then obtained another search warrant authorizing an expanded search of the cell phones.

A. The Car Stop

On May 31, 2023, two New York City Police Department ("NYPD") Detectives, who were also FBI Task Force Officers ("TFOs"), observed a white BMW SUV with a Pennsylvania license plate fail to stop at a stop sign in the vicinity of Charlecote Ridge and Croydon Road in Queens. See Chowdhury Mot., Ex. F (June 9, 2025 Search Warrant) ¶ 22. Law enforcement agents had, at this point, suspected Chowdhury to have kidnapped John Doe-2 on or about May 11, 2023, based on, among other things, an interview with John Doe-2, social media analysis and surveillance video footage depicting the kidnapping. Based on information from open-source databases and other investigative techniques, law enforcement believed that Chowdhury lived in the vicinity of the above-mentioned location and that he drove a white BMW.

One of the TFOs activated the emergency lights on his vehicle to direct the BMW to stop. See id. The BMW pulled over and the two TFOs approached the driver, later identified to be Chowdhury. See id. A female in the front passenger seat identified herself as Chowdhury's fiancée and produced a school identification card bearing the name "Iffat Ara Haque Lubna." See id. A minor sat in the rear passenger seat. See id. The TFOs asked Chowdhury for his driver's license and registration documents. See id. Chowdhury stated that he did not have either document but that he knew a captain in the NYPD, whom he offered to call. See id. One of the TFOs asked for Chowdhury's name. See id. Upon searching in law enforcement databases, this TFO determined that Chowdhury's driver's license had been suspended. See id. The TFO also searched law enforcement databases for the Pennsylvania license plate and learned that the license plate did not correspond to the vehicle. See id. The TFO asked Chowdhury to step out of the vehicle and informed Chowdhury that he was under

arrest for driving with a suspended license. See id. Pursuant to Chowdhury's arrest, the TFO recovered a blue Apple iPhone cell phone (the "Blue Phone") from Chowdhury's person. See id.

While the TFO informed Chowdhury that he was under arrest, Lubna exited from the front passenger seat holding two cell phones, one that she identified as her cell phone, and the other, a red Apple iPhone (the "Red Phone," and together with the Blue Phone, "Chowdhury's Phones"), which had been on top of the center console. See id. Lubna indicated that the Red Phone belonged to Chowdhury. See id. Lubna handed the Red Phone to the police, which the officers planned to inventory with the rest of Chowdhury's personal property during arrest processing. See id. Upon seeing Lubna hand the Red Phone to the police, Chowdhury began speaking in another language to Lubna. See id. Lubna then demanded that the police return the Red Phone to her. See id. Law enforcement declined to do so. See id. Police impounded the car and conducted an inventory search of its contents. See Ex. 3 (property invoice for Chowdhury's vehicle); Ex. 4 (property invoice for the contents of Chowdhury's vehicle); Chowdhury Mot., Ex. G (property invoice for Chowdhury's Phones). Police returned the contents of the car—except Chowdhury's Phones—to a third party. See Ex. 5 (receipt for return of property).

B. The Search Warrant Applications

On June 9, 2024, the Honorable Robert M. Levy, United States Magistrate Judge, issued a warrant authorizing law enforcement officers to search Chowdhury's Phones for records that relate to violations of 18 U.S.C. §§ 371, 1139(a)(4), 1201(a)(1) and 2242(3) (conspiracy, assault by striking or beating, kidnapping and sexual abuse) from May 11, 2023 through May 13, 2023 (the "June 9 Warrant"). See Chowdhury Mot., Ex. F.

Upon executing the June 9 Warrant according to Judge Levy's ordered search parameters and limitations, the affiant observed in plain view a thumbnail photo of a photo

album in the Blue Phone. See Chowdhury Mot., Ex. J ¶ 24. The affiant recognized the individual as John Doe-1 whom he had recently interviewed in person for three hours about his kidnapping. See id. The affiant also observed on the Red Phone that Chowdhury had received a text message from Lubna with a photograph of John Doe-2, approximately eight minutes before John Doe-2 was abducted off the street at approximately 1:00 a.m. on May 11, 2023. See id. ¶ 9. The affiant also learned from executing the June 9 Warrant that cell site data for the Red Phone showed that the Red Phone was in the vicinity of the location where John Doe-2 was abducted for approximately 30 minutes prior to John Doe-2's abduction. See id. These facts indicated that the perpetrators of John Doe-2's kidnapping may have planned and discussed the kidnapping afterwards for a greater duration of time than originally believed. The affiant ceased his review and sought an additional search warrant for Chowdhury's phones authorizing a search of evidence related to John Doe-1's kidnapping and additional evidence of John Doe-2's kidnapping.

On August 4, 2023, the Honorable James L. Cott, United States Magistrate Judge for the Southern District of New York,[3] issued a search and seizure warrant authorizing law enforcement officers to search Chowdhury's phones for violations of 18 U.S.C. § 1201(a)(1) from March 1, 2023 through April 27, 2023 and May 1, 2023 through May 31, 2023 (the "August 4 Warrant," together with the "June 9 Warrant," the "Phone Warrants"). See Chowdhury Mot., Ex. J.

[3] After obtaining the June 9 Warrant, the FBI transported Chowdhury's Phones from the Eastern District of New York to the Manhattan FBI office. To conduct the examination of Chowdhury's Phones according to the June 9 Warrant's parameters, Chowdhury's Phones needed to be stored at the Manhattan FBI office and remain connected to computer systems there that facilitated that review.

IV. Lubna's Arrest and Post-*Miranda* Statement

Lubna was arrested with Chowdhury in the vicinity of the 103rd Precinct stationhouse in Queens on July 10, 2023, pursuant to an arrest warrant issued in connection with the July 7, 2023 indictment charging her with the kidnapping of John Doe-2. Upon her arrest, Lubna was transported to an FBI office in Manhattan. At the time of her arrival, all of the interview rooms that were equipped with recording systems were occupied. While waiting for an interview room with recording equipment to become available, law enforcement agents brought Lubna to a room without recording equipment so that Lubna could sit down. Law enforcement provided Lubna with water and allowed her to use the restroom. Later during her time in custody, law enforcement also offered Lubna food, which she declined. Lubna also stated that she was cold, and an agent provided her with a sweater.

Within approximately one hour and five minutes of Lubna's arrival to the FBI offices, an interview room with recording equipment became available. Law enforcement agents escorted Lubna to that room. Three law enforcement agents—a TFO, an FBI special agent and an NYPD officer who spoke English and Bengali ("the interpreting officer")—entered the room and began the interview, which was videorecorded. The interview began with Lubna asking why she was at the FBI offices, to which the TFO informed her that she was arrested for a kidnapping. Although Lubna wished to respond, the TFO first asked the interpreting officer to read Lubna her Miranda rights. The interpreting officer did so, in Bengali, reading from a Bengali translation of the FBI Miranda form. Lubna waived her Miranda rights and agreed to speak with the law enforcement agents. Law enforcement questioned Lubna about her involvement in the kidnapping of John Doe-2, and showed her evidence such as surveillance video footage of Lubna with John Doe-2 and Chowdhury in a hotel elevator during the kidnapping. The interview lasted approximately two hours. Approximately one hour into the

interview, the interpreting officer showed Lubna still images from surveillance video footage and explained that law enforcement had an idea of the events that had transpired during John Doe-2's kidnapping, but that they did not know all the facts. The interpreting officer, in an even, conversational tone, told Lubna that since she was present for the kidnapping, law enforcement was interested in hearing what she knew, and added that she should not lie or repeat things she had already said. The interpreting officer warned Lubna that lying carried a separate punishment. In response, Lubna stated, "I don't want to say anything else." The interpreting officer replied in Bengali: "That's your choice, but you should say what you know, or not, I don't know." Immediately, Lubna continued the conversation, by stating that she was telling the interpreting officer what she knows, because John Doe-2 had threatened her and that she was not a "touchy" person. Lubna continued to speak with law enforcement for approximately one more hour regarding John Doe-2's kidnapping.

## ARGUMENT

### I. Lubna's Post-Arrest Statement Is Admissible

Lubna's post-arrest statement constituted a knowing and voluntary waiver of her Miranda rights. Therefore, Lubna's statements should not be suppressed. Lubna argues that because she stated that she no longer wished to speak in the middle of her conversation with law enforcement, her statements should be suppressed. See Lubna Mot. 2-3. Lubna also argues that the interpreting officer made additional comments purportedly encouraging Lubna to speak to them. According to Lubna, the above circumstances of her post-arrest statements require suppression of her statements. This contention is meritless, and the motion to suppress Lubna's post-arrest statements should be denied.

A. Legal Standard

When a statement or confession is obtained through interrogation of a defendant who is in custody, the government must demonstrate that the defendant was informed of, and validly waived, her Fifth Amendment rights under Miranda. To prove a valid waiver of Miranda rights, the government must show, by a preponderance of the evidence, that the defendant relinquished her rights voluntarily and that the defendant had a full awareness of the right being waived and the consequences of waiving that right. See Colorado v. Connelly, 479 U.S. 157, 167-69 (1986); United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995). Where the totality of the circumstances reveals an uncoerced choice and the requisite level of comprehension, a court can conclude that Miranda rights have been waived. See Moran v. Burbine, 475 U.S. 412, 421 (1986). This rule is based on the recognition that "[a]dmissions of guilt resulting from valid Miranda waivers 'are more than merely desirable; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law.'" McNeil v. Wisconsin, 501 U.S. 171, 181 (1991) (quoting Moran, 475 U.S. at 421).

Even in the presence of a valid Miranda waiver, however, "[d]ue process requires the suppression of statements not made voluntarily to law enforcement." United States v. Crews, No. 13-CR-835 (VB), 2015 WL 5474185, at *7 (S.D.N.Y. June 8, 2015) (citing J.D.B. v. N. Carolina, 564 U.S. 261 (2011)). A statement is involuntary if it is obtained "under circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will.'" See Oregon v. Elstad, 470 U.S. 298, 304 (1985) (quoting Haynes v. Washington, 373 U.S. 503, 515 (1963)). "No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances." Green v. Scully, 850 F.2d 894, 901 (2d Cir. 1988). In evaluating the totality of the circumstances, courts should consider, among other things, the age

of the accused, education level, intelligence, advice regarding constitutional rights, length of detention, repeated and prolonged nature of the questioning, and the use of physical punishment, such as the deprivation of food or sleep. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).

The critical issue relevant to voluntariness is whether the defendant's will was "overborne" by the conduct of law enforcement officers such that her statements cannot be deemed to be the "product of a rational intellect and a free will." Lynumn v. Illinois, 372 U.S. 528, 534 (1963) (citations omitted). A statement will be deemed voluntary unless it results from circumstances "that overbear the defendant's will at the time it is given." United States v. Taylor, 745 F.3d 15, 23 (2d Cir. 2014) (internal quotation marks and citation omitted). Overarching factors relevant to this determination include "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." Green, 850 F.2d at 901-02.

Compliance with Miranda, although not dispositive, is a significant factor weighing in favor of a finding of voluntariness. Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984). At bottom, "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." Dickerson v. United States, 530 U.S. 428, 444 (2000) (internal quotation marks and alteration omitted); see also United States v. Williams, 681 F.3d 35, 45 (2d Cir. 2012) (suspect's signed waiver of rights was "'highly probative' of voluntariness" (quoting Elstad, 470 U.S. at 318)); United States v. Moore, 670 F.3d 222, 233 (2d Cir. 2012) (similar).

B. Lubna Has Not Established a *Miranda* Violation

Lubna's post-arrest statements should not be suppressed because she was properly administered Miranda warnings, and she knowingly and willingly waived them. To establish

that a defendant validly waived Miranda rights, the government must prove by a preponderance of the evidence "(1) that the relinquishment of the defendant's right was voluntary and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving the right." Jaswal, 47 F.3d at 542 (citing Moran, 475 U.S. at 421). The facts amply meet these criteria. The first topic the TFO (via the interpreting officer) discussed with Lubna was her Miranda rights. The TFO also asked Lubna whether she understood him when he introduced himself, the interpreting officer, and an FBI special agent. Lubna, in English, responded that she understood a little but not much of their conversation. Taking that language barrier into account, the TFO ensured that the interpreting officer issued Miranda warnings verbally and in writing in Bengali using a Bengali version of an FBI form of Miranda warnings. The TFO and the interpreting officer also told Lubna that her rights were her own, separate from those of her husband, and that before they could discuss anything about the reason for her arrest, she needed to be informed of her Miranda rights. After the interpreting officer reviewed those warnings with Lubna orally and in writing in Bengali, she verbally indicated her understanding and signed the Bengali FBI form from which the interpreting officer had read her those rights. Law enforcement and Lubna then began to discuss the kidnapping of John Doe-2, in which Lubna made several incriminating statements.

Lubna acknowledged, among other things, knowing John Doe-2 as a classmate, identifying Chowdhury in video clips depicting the moment that John Doe-2 was abducted, pulling John Doe-2's hair during the kidnapping, and breaking his phone. These statements came after Lubna was given Miranda warnings, orally and in writing, in Bengali, by a Bengali-speaking police officer, and she knowingly and deliberately opted to waive them verbally and in writing. Lubna was a 23-year-old adult, attending online classes in the United States, able to

answer and ask questions in Bengali clearly and intelligently. Lubna was informed of and knew of her constitutional rights and was not subject to a lengthy detention. Lubna was not threatened or promised anything during her interview, and she was given water and offered food, the latter of which she denied. Lubna was provided with water, and a sweater when she complained of the cold. See United States v. Ray, 537 F. Supp. 3d 569, 581 (S.D.N.Y. 2021) (listing similar factors as indicia of a knowing and voluntary waiver of Miranda, leading the court to conclude that the defendant's will had not been overborne).

Lubna avers that when she stated that she did not wish to speak anymore, she was pressured to continue speaking by the interpreting officer in Bengali. However, Lubna's argument fails because the recording (and translated transcript) of her interview[4] does not support this assertion. Instead, Lubna's decision to continue speaking with law enforcement rendered her statement, that she did not wish to speak anymore, an ambiguous statement rather than an invocation of her Miranda rights. See United States v. Berghuis, 560 U.S. 370, 381 (2010) (an accused who wishes "to invoke his or her right to remain silent [must] do so unambiguously); Davis v. United States, 512 U.S. 452, 459-60 (1994) (holding that a suspect's equivocal or ambiguous request for an attorney does not require cessation of questioning, and that "[] the primary protection afforded suspects subject to custodial interrogation is the Miranda warnings themselves). Circumstances in which an arrestee initially waives her Miranda rights, then makes equivocal statements about continuing to speak with law enforcement, and continues to speak with law enforcement, are insufficient to amount to an invocation of exercising Miranda

---

[4] The government will provide a copy of the recorded interview as Exhibit 2 under separate cover. Exhibit 1 provides a transcript of the following timestamps of the interview: 01:15:00-01:18:00, 01:41:03-01:43:59 and 01:49:57-02:04:03, A transcript of the entire video will be submitted this week when the translation is completed.

rights. See United States v. Ross, No. 21-CR-571 (BMC) (LB), 2023 WL 6160436, at *11 (E.D.N.Y. July 31, 2023), report and recommendation adopted, No. 21-CR-571 (BMC), 2023 WL 6158840 (E.D.N.Y. Sept. 21, 2023) (finding the defendant's statements that he "can't talk [] anymore" insufficient to invoke his right to remain silent where, among other conduct, the defendant continued to speak with the officers); United States v. Wilson, 567 F. Supp. 3d 398, 405 (W.D.N.Y. 2021) (defendant stated that he had nothing to say and asked to lay down but continued to speak with the officer, rendering his statement equivocal).

Here, Lubna similarly made an equivocal statement that did not require law enforcement to cease their questioning of her when she stated, "I don't want to say anything else."[5] Lubna had waived her Miranda rights in the beginning of the interview, spoke with the officers, and then stated that she did not wish to speak anymore. However, she then fluidly continued her conversation with the law enforcement agents, speaking with them about the kidnapping of John Doe-2 for a sustained period of time—approximately one more hour. The interpreting officer had shown Lubna evidence that captured portions of John Doe-2's kidnapping and told her that while they had some information regarding John Doe-2's kidnapping, they were looking to fill in the gaps. The interpreting officer warned Lubna that lying carried separate consequences, and Lubna stated that she did not wish to say anything else. The interpreting officer agreed with Lubna that it was her choice not to say anything else, but told her that she should tell them what she either knew or did not know. Lubna immediately continued her conversation with law enforcement, stating that she was telling them what she knew because John Doe-2 had, in fact, threatened her.

[5] Lubna's transcription translates this sentence as, "I don't want to talk anymore." See Lubna Mot., Ex. A.

With the government's fuller translation of the interview attached as Exhibit 1, Lubna's statement, in the context of the conversation with the TFO and the interpreting officer, was equivocal when she immediately continued speaking about John Doe-2, despite expressing that she did not wish to speak any more about his kidnapping. After saying that she did not wish to say anything else, approximately seven seconds later, Lubna added that John Doe-1 had threatened her and physically touched her. See Ex. 1, 01:56:44-01:57:00. Like the defendants in Ross and Bradley v. Meachum, 918 F.2d 338, 342 (2d Cir. 1990), Lubna urges this court to consider her statement in the middle of the interview, that she no longer wished to say anything else, in a vacuum. In an effort to do so, Lubna includes selective excerpts in her proffered transcription that inaccurately portray her equivocal statements as an unambiguous invocation of her right to silence. The Court should reject this invitation and properly consider the entirety of the interview and contextualize her statement. As the Supreme Court in Davis noted, Lubna's primary protection was her initial Miranda warnings, which she knowingly and voluntarily waived. Those warnings included the provision that she could stop speaking at any time. Lubna chose not to do so. Rather, Lubna's continuation of the conversation, similar to the circumstances in Ross and Wilson, rendered her statement that she did not want to talk anymore equivocal. Based on these circumstances, Lubna did not unambiguously invoke her right to silence, and her statement should not be suppressed.

Although the government's and Lubna's transcriptions and translations of the July 10, 2023 interview do not materially differ on the portions that Lubna chose to include in Exhibit A of her Motion ("Lubna's Exhibit"), Lubna's Exhibit includes excerpted selections of the interview that create a misleading picture of the context and circumstances surrounding her statement. The Court must examine not just the statement in question, but the larger context to

determine whether a defendant has invoked the right to silence. Ross, 2023 WL 6160436, at *9 (citing Bradley, 918 F.2d at 342). Such an analysis is especially important because a subsequent statement can render an unequivocal statement into an ambiguous one. See id.; see also Bradley, 918 F.2d at 342 (holding that defendant failed to invoke his right to silence when he first stated that he did not wish to discuss his involvement in robbery but then immediately denied any connection to robbery and proffered alibi). The Lubna Exhibit's selectively thin transcript inaccurately portrays the interview as if the interview had been a lopsided conversation in which law enforcement merely accused Lubna of lying and cornered her into refusing to speak anymore. The government's fuller transcription shows that this was not the case—law enforcement had a steady stream of conversation back and forth with Lubna, in which law enforcement simply explained to Lubna that they were trying to ascertain the full picture of John Doe-2's kidnapping and that the evidence contradicted some of her statements. Lubna's Exhibit also omits portions in which Lubna engaged with law enforcement in this conversation, telling them that John Doe-2 had blackmailed her and that other girls also had problems with John Doe-2. Lubna's Exhibit is devoid of this important context, which rendered her statement that she did not "want to say anything else" ambiguous, in light of the fact that she said so: (1) after she had been given Miranda warnings that she validly waived, (2) in the middle of a nearly two-hour long, uninterrupted conversation and (3) before she immediately continued speaking with law enforcement for another hour.

Lastly, even if the Court were to find that Lubna did unambiguously invoke her right to silence, the remedy should not be to suppress all her statements. Lubna's statements made after her valid waiver of Miranda rights and before her purported invocation of her right to silence should be admissible, and only those statements that the defendant made after the alleged

Miranda violation occurred should be suppressed. See United States v. Zamora, 42 F. Supp. 3d 397, 402 (N.D.N.Y. 2014) (denying suppression of defendant's statement after he waived rights Miranda rights, but granting suppression of statements made prior to Miranda warnings in response to questions likely to elicit an incriminating response); United States v. Morel, No. 09-CR-493 (KAM), 2010 WL 2545479, at *14 (E.D.N.Y. June 18, 2010) (denying suppression in part where one set of the defendant's statements resulted from a proper waiver of Miranda rights, and granting suppression in part where another set of statements resulted from a violation of the defendant's right to counsel). Here, if the Court were to determine that Lubna's statement, "I don't want to say anything else" was an unambiguous or unequivocal invocation of her right to silence, only the subsequent statements Lubna made should be suppressed. Lubna's statements to law enforcement prior to that sentence were clearly made after she made a knowing and voluntary waiver of her Miranda rights and in the absence of any circumstances in which her will could have been overborne.

C. There Are No Material Facts in Dispute Regarding Lubna's Post-*Miranda* Statement

Lubna's motion to suppress fails to identify any material factual dispute that requires a hearing. With the entirety of her statements to law enforcement videorecorded and her Miranda waiver documented in writing, bearing her signature, the record is clear. Instead, Lubna's argument focuses on the legality of law enforcement's conduct after Lubna stated that she no longer wished to speak. Legal arguments do not warrant a hearing.

1. Legal Standard

A defendant has no absolute right to an evidentiary hearing on a motion to suppress evidence. See In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d at 165 ("[A]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers

are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." (internal quotation marks and citation omitted)). A material factual dispute must exist for a hearing to be justified. See United States v. Gillette, 383 F.2d 843, 848 (2d Cir. 1967) (holding that suppression hearing is available only if there is a "factual issue to be resolved"); United States v. Ashburn, 76 F. Supp. 3d 401, 436 (E.D.N.Y. 2014) (Garaufis, J.) ("It is well established that a defendant must show that disputed issues of material fact exist before an evidentiary hearing is required." (citation omitted)). "If the defendant's request for a hearing is not accompanied by a sufficient 'specification of the factual basis for the characterization, the district court is not required to have a hearing.'" United States v. Spencer, No. 06-CR-413 (DLI), 2016 WL 6781225, at *5 (E.D.N.Y. Nov. 15, 2016) (quoting United States v. Mathurin, 148 F.3d 68, 69 (2d Cir. 1998) (per curiam) (alteration omitted)).

It is not enough simply to attach an affidavit to moving papers; the defendant must assert facts which, taken as true, would merit the suppression of the challenged evidence. See United States v. Chandler, 164 F. Supp. 3d 368, 376 (E.D.N.Y. 2016) ("[I]f facts urged in support of a hearing would not entitle the moving party to relief as a matter of law, no evidentiary hearing is required.") (quotation marks and citation omitted); see also United States v. Townsend, No. 15-CR-653 (DLI), 2016 WL 3562055, at *2 (E.D.N.Y. June 23, 2016).

2. Lubna's Legal Argument Does Not Warrant a Hearing

Lubna's argument to suppress her post-arrest statement raises a purely legal objection based on facts that can all be determined on the face of the videorecorded interview. See Lubna Mot. at 6. Lubna did not include an affidavit to support her motion but relies on the

Lubna Exhibit's selective transcript of the videotaped post-arrest statement.[6] Lubna Mot. at 1, Ex. A. Indeed, Lubna does not claim that she had any other conversations with law enforcement that were not captured on the videorecorded interview. Because Lubna's statements are recorded in their entirety on video and her waiver of her Miranda rights is documented on the FBI form she signed, as captured in the video, the facts and the record are clear. With this record, the parties' disagreement lies in the legality of law enforcement's conduct during Lubna's interview, namely, whether she made an unambiguous invocation of her right to be silent. A hearing is not required for the Court to render a decision on a purely legal argument. Ashburn, 76 F. Supp. 3d at 436 (E.D.N.Y. 2014) (collecting cases for the proposition that "a defendant must show that disputed issues of material fact exist before an evidentiary hearing is required"). Therefore, the record contains sufficient evidence for the Court to deny Lubna's Motion without a hearing.

## II. Lubna's Motion for a Bill of Particulars Should Be Denied

Lubna contends that a bill of particulars is necessary "to understand the nature of the substantive kidnapping and conspiracy to kidnap charges alleged in connection with John Doe-3 (Counts 5-6)." Lubna Mot. at 12. Specifically, Lubna states that the bill of particulars should identify the specific benefit she sought to receive from kidnapping John Doe-3 and the time, place and manner of any communications made with a cell phone or the internet in furtherance of the kidnapping of John Doe-3. Lubna Mot. at 12-13. As set forth below, Lubna's arguments are without merit, and her motion for a bill of particulars should be denied.

[6] Lubna's counsel attached a declaration regarding the Lubna Exhibit, but he did not raise any factual dispute outside the videorecorded interview.

A. Legal Standard

Federal Rule of Criminal Procedure 7(c) requires that an indictment set forth only a "plain, concise, and definite written statement of the essential facts constituting the offense." "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974) (citations omitted); see also United States v. Fruchter, 104 F. Supp. 2d 289, 296 (S.D.N.Y. 2000) (quotations and citations omitted). The Second Circuit has made clear that an indictment satisfies the requirements of Rule 7(c) even if it "do[es] little more than [] track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." United States v. Yannotti, 541 F.3d 112, 127 (2d Cir. 2008). Additional details, in the form of a bill of particulars, see Fed. R. Crim. P. 7(f), are appropriate only when the indictment is too vague to inform the defendant of the nature of the charges to allow the preparation of a defense, avoid unfair surprise, and assert a double jeopardy claim. See United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987); United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990) (bill of particulars required "only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused") (internal quotation marks omitted). If the information sought by the defendant is provided in the indictment or through some other means, a bill of particulars is not warranted. See Bortnovsky, 820 F.2d at 574. "The defendant bears the burden of showing 'the information sought is necessary,' and that he will be prejudiced without it." United States v. Shkreli, No. 15-CR-637, 2016 WL 8711065, at *4 (KAM) (E.D.N.Y. Dec. 16, 2016) (quoting Fruchter, 104 F. Supp. 2d at 312). The decision to grant or deny a bill of particulars is committed to the sound

discretion of the trial court. Fruchter, 104 F. Supp. 2d at 311 (quoting United States v. Panza, 750 F.2d 1141, 1148 (2d Cir. 1984)).

A defendant cannot use a bill of particulars as an investigative tool or as a pre-trial discovery device. See United States v. Pimentel, No. 99-CR-1104 (SJ), 2001 WL 185053, at *4 (E.D.N.Y. Jan. 22, 2001) (citations omitted). Rule 7(f) also may not be used to limit the government's evidence at trial or to flesh out its prosecutorial theories or methods of proof in advance of trial. See United States v. Johnston, No. 23-CR-13 (NRM), Tr. of Tel. Conf. at 3-5 (E.D.N.Y. Nov. 1, 2024) (oral decision); Shkreli, 2016 WL 8711065, at *7 (collecting cases); see also United States v. Sattar, 314 F. Supp. 2d 279, 318 (S.D.N.Y. 2004) ("The Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crimes charged, or a preview of the Government's evidence or legal theories.") (citation omitted).

Thus, "courts have routinely held that the 'wheres, whens and with whoms' of a charged offense are beyond the proper scope of a bill of particulars." United States v. Shteyman, No. 10-CR-347 (SJ), 2011 WL 2006291, at *5 (E.D.N.Y. May 23, 2011) (quoting United States v. Rivera, No. 09-CR-619 (SJF), 2011 WL 1429125, at *8 (E.D.N.Y. Apr. 13, 2011)); see also United States v. Trippe, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) ("demands for particular information with respect to where, when, and with whom the Government will charge the defendant with conspiring are routinely denied"). "The ultimate test in determining whether a bill of particulars is appropriate is whether the information is necessary, not whether it is helpful to the defendant." United States v. Rivera, No. 09-CR-619 (SJF), 2011 WL 1429125, at *8 (E.D.N.Y. Apr. 13, 2011) (emphasis added and citations omitted).

B. Lubna Has Not Established Her Need for a Bill of Particulars

Lubna has been provided with ample notice of the nature of the charges against her regarding John Doe-3, through not only the details in the Second Superseding Indictment, but also the discovery and other court filings in this case, eliminating the need for a bill of particulars. See United States v. GAF Corp., 928 F.2d 1253, 1260 (2d Cir. 1991); see also United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999) ("A bill of particulars is required only where the charges are so general that they do not advise the defendant of the specific acts of which he is accused." (internal citation and quotation marks omitted)). Lubna states that the charges in the Second Superseding Indictment alleging that she kidnapped John Doe-3 "for ransom and reward and otherwise" and that she "communicated with others regarding the kidnapping using cellular telephones" require her to guess what incentive she had to kidnap John Doe-3 and how she used a cell phone to do so. Lubna Mot. at 12-13. However, this argument fails to establish that Lubna is burdened or prejudiced without this information. See United States v. Maneti, 781 F. Supp. 169, 186 (W.D.N.Y. 1991) ("[T]he burden is on the defendant to show that non-disclosure of the requested particulars will lead to prejudicial surprise at trial or will adversely affect his rights.")

Instead, Lubna's request is an attempt to compel the government to disclose the manner in which it will prove the kidnapping charges pertaining to John Doe-3, contravening the purpose of a bill of particulars. See United States v. Ianniello, 621 F. Supp. 1455, 1478 (S.D.N.Y. 1985) ("To require most of the further disclosure the defendants seek would do little more than restrict the government's proof at trial, which is not the purpose of a bill of particulars."). Where sufficient information is provided in the indictment or through some other means, including discovery, a bill of particulars is not warranted. See Walsh, 194 F.3d at 47; United States v. Helbrans, 547 F. Supp. 3d 409, 432 (E.D.N.Y. 2021). In Johnston, this Court

specifically found that information seeking "the manner in which the government will attempt to prove the charges, is beyond the scope of a bill of particulars" and denied a motion seeking the same. See Tr. of Tel. Conf. at 5:7-10. The defendant in Johnston, like Lubna, did not claim that the charges were so general and failed to advise him of the specific acts of which he was accused, nor did he argue that he had not been provided discovery relevant to those charges. See id. at 4:10-14. Instead, Johnston requested that the government identify the messages supporting Count Four in his indictment, as he was unable to identify them in his review of the discovery. See id. at 4:14-18. Here, Lubna makes a nearly identical argument in asking for a bill of particulars so that the government can identify which communications were used in furtherance of the kidnapping charged in Counts Five and Six and the benefit Lubna received in the commission of that kidnapping. Lubna's request must therefore fail on the same grounds that this Court relied on in Johnston.

The Second Superseding Indictment charges Lubna in Counts Five and Six, respectively, with conspiring to kidnap and kidnapping John Doe-3. Second Superseding Indictment ¶¶ 7-9. In particular, the kidnapping conspiracy count lists co-defendants Chowdhury, Ruhel Choudhury, and Shaidhual Chowdhury as co-conspirators and identifies the instrumentalities of interstate and foreign commerce used to commit that kidnapping as cellular telephones and the internet. Id. at ¶ 7. Additionally, the Second Superseding Indictment lists three overt acts that Lubna specifically, along with co-defendants Chowdhury and Shaidhual Chowdhury, committed to further the conspiracy on or about May 10, 2023: (1) Lubna communicated with both of the above-mentioned co-defendants on cellular telephones regarding the kidnapping and assault of John Doe-3; (2) Lubna, with both of the above-mentioned co-defendants, confined John Doe-3 in a BMW X5 in the vicinity of Long Island City, Queens, and

drove John Doe-3 around Queens; and (3) Lubna, with both of the above-mentioned co-defendants, assaulted John Doe-3 in Queens. Id. ¶ 8a-c. Count Six charges Lubna with the substantive charge of kidnapping John Doe-3 in or about May 2023, and specifies that the instrumentalities of interstate and foreign commerce used to commit that crime were cellular telephones and the internet. Id. at ¶ 9. The allegations charging Lubna with conspiracy and substantive kidnapping of John Doe-3 are sufficiently particularized to provide the "wheres, when and with whoms" of each charged offense so that she has adequate notice as to the charges she faces to which she can prepare a defense. See Shteyman, 2011 WL 2006291, at *5 (internal citations omitted). Against this backdrop of the details in the allegations charged for the kidnapping of John Doe-3, Lubna's requests to specify the benefit she would receive from kidnapping John Doe-3 and to identify the particular communications that furthered the kidnapping amount to an improper use of Rule 7(f) as a mechanism to limit the government's evidence, or to flesh out the government's anticipated presentation of such evidence at trial. See United States v. Urso, 369 F. Supp. 2d 254, 272 (E.D.N.Y. 2005) ("As a general rule, a defendant is not entitled to receive details of the government's conspiracy allegations in a bill of particulars."); Sattar, 314 F. Supp. 2d at 318 ("The Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crimes charged, or a preview of the Government's evidence or legal theories." (citation omitted)).

Moreover, contrary to Lubna's argument, the Second Superseding Indictment, court filings, and discovery provide even more details about the kidnapping of John Doe-3 that further render a bill of particulars to be inappropriate. For example, the government's letter to the court regarding pretrial release conditions as to Shaidhual Choudhury provides a detailed

account of John Doe-3's kidnapping, including but not limited to: (1) background regarding how John Doe-3 became acquainted with Lubna and Chowdhury; (2) the accusation Lubna and Chowdhury lobbed at John Doe-3 of besmirching Lubna's reputation when the kidnapping began; (3) a video call that John Doe-3's friend screen-recorded and received during the kidnapping in which Lubna and Chowdhury interrogated the friend about whether John Doe-3 had in fact spread rumors about Lubna and (4) a phone call Chowdhury made to co-defendant Shaidhual Chowdhury to meet him, to bring weapons and to assault John Doe-3. See ECF No. 204 at 2. Additionally, the government has produced discovery to supplement the details in the Indictment pertaining to the kidnapping of John Doe-3. These disclosures include but are not limited to: (1) the screen-recorded video call between John Doe-3, Lubna and Chowdhury described in the government's letter regarding Shaidhual Chowdhury's pretrial detention conditions (Bates stamped as EDNY_008850 SENSITIVE and produced on January 30, 2025)[7]; (2) draft translations of approximately three hours of audio recordings capturing John Doe-3's kidnapping, which include Lubna as a participant in the conversations (Bates stamped as EDNY_008393 SENSITIVE-EDNY_008849 SENSITIVE and produced on January 30, 2025); (3) extractions from cell phones belonging to Chowdhury pertaining to John Doe-3's kidnapping, such as photos of John Doe-3 with Chowdhury and Lubna prior to the kidnapping.

Clearly, Lubna has ample notice of not only the charges against her, but also additional information as to the context of those charges and the facts the government expects to present at trial. The law is clear that a defendant is not entitled to discover, through a bill of particulars, the exact times and places at which the crime occurred or the identities of the

---

[7] Any discovery Bates stamped as "SENSITIVE" was provided to counsel pursuant to the protective orders entered by the parties in this case. See ECF Nos. 127, 168.

witnesses and the evidence that will establish the crime charged. See United States v. Tramunti, 513 F.2d 1087, 1113 (2d Cir. 1975); United States v. Carroll, 510 F.2d 507, 509 (2d Cir. 1975) ("There is no general requirement that the government disclose in a bill of particulars all the overt acts it will prove in establishing a conspiracy charge."). The ultimate test of the appropriateness of a bill of particulars, therefore, is whether the information is necessary, not whether it is helpful, to the defendant. See Helbrans, 547 F. Supp. 3d at 432; United States v. Aliperti, 867 F. Supp. 142, 148 (E.D.N.Y. 1994). Lubna's request for a bill of particulars identifying the specific benefit she received from kidnapping John Doe-3 and the cellular communications she used to further that kidnapping fails that test. Therefore, Lubna's argument that a bill of particulars is necessary is without merit and the request should be denied.

## III. John Doe-1's and John Doe-2's Eyewitness Identifications Were Proper

Chowdhury claims that the photo arrays shown to John Doe-1 and John Doe-2 were unduly suggestive, and that John Doe-1 and John Doe-2's identifications of Chowdhury are not independently reliable. See Chowdhury Mot. at 9-14. As detailed below, these claims are at odds with the law and the facts.

### A. Legal Standard

"Only when evidence is so extremely unfair that its admission violates fundamental conceptions of justice have [the courts] imposed a constraint tied to the Due Process Clause." Perry v. New Hampshire, 565 U.S. 228, 237 (2012) (citation and internal quotation marks omitted). The Second Circuit employs a two-step inquiry in determining whether a pretrial identification runs afoul of the Due Process Clause, asking first whether the pretrial identification procedure was unduly suggestive, and, if the court determines that it was, whether that identification is nevertheless admissible as "independently reliable" under the totality of the circumstances. See United States v. Maldonado-Rivera, 922 F.2d 934, 973 (2d Cir. 1990).

When faced with an allegation that a photo array was improperly suggestive, courts evaluate, among other things, the number of photographs in the array, the manner in which it was presented by law enforcement, and the similarities or differences among the photographs. See Simmons v. United States, 390 U.S. 377, 383–84 (1968). Where there is nothing inherently prejudicial about the presentation, the "principal question is whether the picture of the accused . . . so stood out from all of the other photographs as to suggest to an identifying witness that [the accused] was more likely to be the culprit." United States v. Concepcion, 983 F.2d 369, 377 (2d Cir. 1992) (citation and internal quotation marks omitted). "Generally, pretrial photographic identification procedures violate due process only if they are 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" United States v. Jacobwitz, 877 F.2d 162, 167 (2d Cir. 1989) (quoting Simmons, 390 U.S. at 384). The Second Circuit has described this as "a fairly permissive standard." Brisco v. Ercole, 565 F.3d 80, 90 (2d Cir. 2009).

Courts routinely reject claims that moderately distinguishing features of a defendant's photo in a six-photograph photo array render the identification proceeding unduly suggestive. See, e.g., Velazquez v. Poole, 614 F. Supp. 2d 284, 322, 326-27 (E.D.N.Y. 2007) (rejecting claim of undue suggestiveness of six-photograph photo array where defendant was Hispanic, three men depicted did not appear Hispanic, and only two men depicted matched description given by victims); United States v. Washington, No. 05 CR 558 (NG), 2006 WL 3359060, at *1-2 (E.D.N.Y. Nov. 17, 2006) (same where only defendant had a white streak in his hair, but the six men depicted were "of similar age, complexion, hair color, and eye color"); United States v. Levy, No. 04 CR 559 (NGG), 2005 WL 2179650, at *2 (E.D.N.Y. Sept. 9, 2005) (same where defendant was the only individual with facial hair, but photo array depicted

six "African-American men of approximately the same age, roughly similar complexion . . . and roughly similar hairstyles"); see also United States v. Hamideh, No. 00 CR 950 (NRB), 2001 WL 11071, at *1 (S.D.N.Y. Jan. 3, 2001) (same where defendant was the only individual depicted smiling).

If the Court finds that the identification procedure was not unduly suggestive, the challenge fails and the "trial identification testimony is generally admissible without further inquiry into the reliability of the pretrial identification." Maldonado-Rivera, 922 F.3d at 973. In those circumstances, questions regarding the reliability of the identification are left for the jury and go to the weight the evidence should be afforded. See Jarrett v. Headley, 802 F.2d 34, 42 (2d Cir. 1986). On the other hand, if the pretrial identification procedure was unduly suggestive, the Court then moves to the second inquiry: whether the identification testimony is nevertheless admissible as independently reliable under the totality of the circumstances. See Maldonado-Rivera, 922 F.2d at 973. To determine whether an identification is independently reliable, a court considers (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. Neil v. Biggers, 409 U.S. 188, 199–200 (1972). No single factor is dispositive. See Concepcion, 983 F.2d at 377.

"[A] defendant moving to suppress a pre-trial photo array identification must make a threshold showing that the procedures that led to the defendant's identification were unduly suggestive." Levy, 2005 WL 2179650, at *2 (citing United States v. Leonardi, 623 F.2d 746, 755 (2d Cir. 1980)). Where such a showing is not met, a hearing is not warranted. See Washington, 2006 WL 3359060, at *2 (denying request for hearing for failure to meet threshold

showing); Hamideh, 2001 WL 11071, at *1 (same); United States v. Persico, No. 92 CR 351 (CPS), 1994 WL 3667, at *23 (E.D.N.Y. Jan. 28, 1994) (same)

B. The Photo Arrays Were Not Unduly Suggestive

The photo arrays here were not unduly suggestive. In each case, the kidnapping victims were shown arrays of six photos, and courts in this circuit regularly uphold photo arrays of this size. See, e.g., United States v. Marsh, 655 F. App'x 5, 7 (2d Cir. 2016) (summary order); United States v. Lee, 600 F. App'x 8, 13 (2d. Cir. 2016) (summary order); United States v. Morgan, 690 F. Supp. 2d 274, 283 (S.D.N.Y. 2010) ("Courts in this Circuit have held that a photo array containing six or more photographs is sufficiently large so as not to be unduly suggestive."). Nothing in the array "suggest[ed] to an identifying witness that [the accused] was more likely to be the culprit." Concepcion, 983 F.2d at 377. All six of the photos were men similar in appearance, and all six of the photos were presented in the same, uniform format. See Chowdhury Mot., Exs. L and M. Chowdhury does not contend otherwise.[8] Chowdhury's objections to these photo arrays, discussed below, are without merit.

1. There Is No Requirement That a Photo Array Be Double-Blind

Chowdhury first claims that the photo arrays were unduly suggestive because "the arrays were not 'double-blind'"—"the administrators . . . knew the identity of their suspect." Chowdhury Mot. at 10. The defendant cites no authority, in this circuit or elsewhere, that a photo array is unduly suggestive merely because it is not double blind.[9] See id. at 10-11. Nor is

[8] With respect to both photo arrays, Chowdhury's sole basis for arguing that his photo stood out from the others is the arrest date. See infra § Argument, III.B.4.

[9] Chowdhury relies on a New Jersey Supreme Court case citing literature on the benefits of a double-blind identification process, a footnote from a Seventh Circuit case doing the same, two law review articles and a Department of Justice training manual. See Chowdhury

the government aware of any precedent requiring that a photo array be double blind. See United States v. Schaffer, No. 12-CR-430 (ARR), 2014 WL 1515799, at *7 (E.D.N.Y. Apr. 18, 2014) ("[The defendant] also submits that the manner of the photo arrays was suggestive because the photos were shown simultaneously rather than sequentially and because they were not doubleblind . . . . Defendant relies entirely on social science research and does not cite a single case from this circuit in support of his contentions that such procedures are unduly suggestive."); cf. Marquez v. Barrone, No. 22-2855, 2024 WL 2828468, at *2 (2d Cir. June 4, 2024) (noting, in habeas corpus context, that defendant did not "cite any Supreme Court precedent that requires law enforcement officers to employ a double-blind procedure"). Because there is no legal requirement that the photo arrays be double blind, the Court should reject Chowdhury's challenge on this ground.

2. Defendant's Speculation About the Identification Procedures Is Insufficient

Other than the legally unsupported complaint that the photo arrays should have been double blind, Chowdhury does not identify any other aspect of the identification procedures that would render the arrays unduly suggestive.[10] Nevertheless, Chowdhury speculates as to a handful of purportedly unknown facts to call into doubt the suggestiveness of the photo arrays: "when or where the pretrial identification occurred" and "the instructions given to [John Doe-1]." or Chowdhury Mot. at 13-14. The answers to these speculative questions are not necessary to determine whether the arrays were unduly suggestive, and Chowdhury cannot rely

---

Mot. at 10-11. In other words, even the defendant's out-of-circuit citations do not state that an identification is unduly suggestive if not double-blind.

[10] The May 22 photo array instructions were produced to Chowdhury and are attached as Exhibit 10. Other than his complaint that the photo array should have been double blind, Chowdhury provides no criticism of the procedures followed here. Chowdhury did not attach the instructions or discuss them at all.

merely on speculation to allege that a photo arrays were unduly suggestive. Indeed, in United States v. Bracy, No. 20-CR-483 (ARR), 2022 WL 17801133 (Dec. 19, 2022), Judge Ross refused to hold a hearing under essentially the same circumstances. In Bracy, the defendant "argue[d] only that the procedures were not double-blind and are otherwise 'a mystery,'" and Judge Ross held: "But [the defendant] points to no authority stating that a double-blind procedure is required, and I need not grant a Wade hearing based on pure speculation." Id. at *2.

Regardless, Chowdhury does have much of this information: Although Chowdhury claims not to know "when . . . the pretrial identification occurred," Chowdhury refers to both throughout his motion by their dates. Chowdhury's Exhibit I also shows that the May 22 photo array was administered inside a "residence,"[11] and even without the instructions given to John Doe-1, the narrative explanation of John Doe-1's identification of Chowdhury provides a sufficient explanation as to how it was administered, see Chowdhury Mot., Ex. N .[12] Accordingly, Chowdhury's speculation regarding the circumstances of these pretrial identifications does not render them unduly suggestive.

3. The Use of Arrest Photos in a Photo Array Is Proper

Chowdhury also claims that both photo arrays were "highly suggestive" because the photos "included arrest dates, police logos, and 'mugshot' links." Chowdhury Mot. at 11. Chowdhury cites no law at all for this claim, and in fact, the Second Circuit has squarely upheld

[11] Chowdhury offers no explanation as to how the setting of the photo array could have rendered it unduly suggestive, or unreliable.

[12] The instructions given before the John Doe-2 May 22 photo array were attached to the Form 302 that memorialized the photo array and were produced to Chowdhury prior to his filing this motion. They are attached here as Exhibit 10.

such photo arrays. For example, in Concepcion, a witness was shown a six-photo array which "consisted of mug shots," all of which "bore legends indicating" the county of arrest. 983 F.2d at 378-79. The Second Circuit found no issue on the ground that the array was composed of arrest photos and did not find issue even with including the counties of arrest.[13] See id. The Second Circuit and district courts in the circuit have repeatedly upheld photo arrays composed of arrest photos. See United States v. Archibald, 734 F.2d 938, 940 (2d Cir. 1984) (holding that photo array with "identification plates showing the date and borough of [the individual's] arrest" was not impermissibly suggestive, but criticizing failure to remove captions before displaying photos to witnesses); United States v. Restrepo, No. 01-CR-1113 (SAS), 2002 WL 10455, at *3-4 (S.D.N.Y. Jan. 3, 2002) (holding that "there is nothing improper" about photo array that mixed "Polaroid head shots" with photos of persons wearing "arrest placards around their necks"); United States v. Luguis, 166 F. Supp. 2d 776, 781 (S.D.N.Y. 2001) (upholding photo array in which ten of fifteen suspects wore "New York State identification tags" that according to defendant "suggest[ed] that these [ten] individuals had already been arrested" (second alteration in original)); United States v. Uccio, No. 88-CR-906 (MBM), 1989 WL 63111, at *1 (S.D.N.Y. June 8, 1989) (ability of witness to tell that photographs were all "mug shots" due to incomplete covering of individuals' "identification plates" "adds nothing and does not make the array suggestive at all, let alone impermissibly suggestive"); cf. Jarrett, 802 F.2d at 43-44 (holding, in habeas corpus context, that photo array in which "several pictures displayed such an origin [i.e.,

[13] The Concepcion court did determine that the witness's "pretrial identifications were not sufficiently reliable to permit him to identify [the defendant] at trial"—though it also found the error to be harmless 983 F.2d at 379. This ruling was based on the witness's inability to identify the defendant at a Wade hearing and a subsequent analysis of the identification's reliability. See id. This aspect of the court's ruling does not affect whether the photo array was suggestive, the purpose for which the case is cited here. (Nor is there any question of whether the identifications in this case were independently reliable. See infra § Argument, III.C.)

were police photographs] would not provide a basis for concluding that the array was impermissibly suggestive"); Ragunauth v. Ercole, No. 07-CV-1692 (NG), 2008 WL 5401586, at *1, *8 (E.D.N.Y. December 23, 2008) (upholding state court ruling in habeas corpus context that photo array consisting of over 1000 "arrest photos" "was not unduly suggestive").[14] In light of this substantial case law, Chowdhury's claim that the use of arrest photos rendered the photo arrays unduly suggestive should be rejected.

4. The Arrest Dates Were In No Way Suggestive

Chowdhury also argues that the photo arrays were unduly suggestive based on the recency of Chowdhury's arrest dates compared to the other photos in the arrays. Chowdhury Mot. at 11-12. This argument fails for a number of reasons.

First, as a factual matter, all of the arrest dates are actually quite similar and recent. In the May 22, 2023 photo array, five of the six photos have arrest dates between January 25, 2023 and March 18, 2023, and Chowdhury's photo does not even have the most recent arrest date. The sixth photo in the May 22 photo array has an arrest date of November 25, 2022, still within six months of the administration of the photo array. In the June 14, 2023 photo array, all six photos had arrest dates within the previous five months. Accordingly, even taking

[14] The Second Circuit and courts in this district have routinely upheld photo arrays consisting entirely of "mug shots," without being explicit as to whether the "mug shots" were arrest photos or just photos taken in that style. See, e.g., United States v. Thai, 29 F.3d 784, 809 (2d Cir. 1994) (photo array consisting entirely of "mug shots" was "not unduly suggestive"); United States v. Bautista, 23 F.3d 726, 731 (2d Cir. 1994) ("the pre-trial identification procedure and the photo array were not unnecessarily suggestive" where "[e]ach photograph depict[ed] a man in a frontal mug-shot"). Mugshot is commonly defined as "a photograph of usually a person's head and especially face[;] specifically: a police photograph of a suspect's face or profile." Merriam-Webster, "mug shot," https://www.merriam-webster.com/dictionary/mug%20shot (emphasis in original). Considering the word's ordinary meaning, one can infer the photos in these arrays were arrest photos. In any event, Concepcion, Jarrett, Archibald, Ragunauth, Restrepo, Luguis and Uccio all undoubtedly examined photo arrays with arrest photos and all were upheld as not unduly suggestive.

Chowdhury's arguments on its own (flawed) terms, his arrest date does not stand out as markedly more recent than the others. "The differences complained of by [the defendant] 'would hardly suggest to an identifying witness that the [the defendant] was more likely to be the culprit." United States v. Bautista, 23 F.3d 726, 731 (2d Cir. 1994) (quoting Archibald, 734 F.2d at 940) (second alteration in original).

Second, Chowdhury cites no legal authority for his claim that the dates of arrest can render a photo array unduly suggestive. Instead, Chowdhury relies on inapposite citations to cases where physical characteristics were found to be highly suggestive. See Chowdhury Mot. at 12. The court in United States v. Luguis rejected a materially similar claim. In that case, ten of the fifteen photos shown in an array were of individuals wearing New York State identification ("NYSID") tags. 166 F. Supp. 2d at 781. The defendant in Luguis was one of those ten photos, and he argued that "because the date on his NYSID tag, '7 28 96,' is both the most recent date and the only date after the date of the alleged robbery, '[a] witness viewing these photos could easily surmise . . . that the subjects arrested prior to the date of the offense were in custody at the time of the robbery and could not have perpetrated the crime.'" Id. (quoting defendant's brief) (alterations in original). The court flatly rejected this argument:

> Even if the witness correctly interpreted the '7 28 96' as the date and saw that the date was the most recent out of the ten photographs of individuals wearing NYSID tags, the Court does not find it at all probable that the witness would then have thought that only the defendant was not in custody at the time of the alleged robbery.

Id. at 781-82. The Luguis court specifically contrasted defendant's arrest date argument with cases where a defendant's photo "was determined to be impermissibly suggestive based upon distinctive features of the defendant's photograph, that photograph was not merely distinct from the other photographs, but was distinct in that it closely matched descriptions of the defendant

previously provided by the witness." Id. at 782. Here, there was no reason to believe that a more recent arrest date would more "closely match[] descriptions of the defendant previously provided by the witness." Id.

Courts have also rejected similar claims concerning photo arrays that included the place of an individual's arrest. Archibald is directly on point. In Archibald, the Second Circuit criticized the inclusion of arrest captions in a photo array but nevertheless unequivocally rejected a claim that an array was unduly suggestive because the defendant's photo "was the only one that showed that he was arrested in the Borough of Manhattan." 734 F.2d at 940. The crime, a robbery, was committed in Manhattan. The Second Circuit held that the "argument is without merit" because "the caption is so insignificant" and because "the boroughs listed on the other mugshots are all immediately adjacent to Manhattan." Id.; see also Jarrett, 802 F.2d at 41 ("It is not required, however, that all of the photographs in the array be uniform with respect to a given characteristic."). Here, the arrest dates are "insignificant" features of the pages presented to John Doe-1 and John Doe-2. The arrest dates are significantly smaller than the individuals' actual photos, they are not prominently positioned on the pages, and they are in the same font as the other information on the page (i.e., the NYPD header, the NYSID number and the arrest number). See Chowdhury Mot., Exs. L and M. Likewise, just as the other boroughs were "immediately adjacent to Manhattan," the other arrest dates in both arrays are close in time to Chowdhury's. The Second Circuit has reaffirmed its holding in Archibald and at least one district court has held the same. See Concepcion, 983 F.2d at 378 ("An array is not unduly suggestive merely because legends on the pictures reveal that the defendant was arrested in one borough and the other persons were arrested in another."); Restrepo, 2002 WL 10455, at *4 (rejecting defendant's argument that array was "impermissibly suggestive" because inter alia the

crime occurred in the Bronx, and some of the individuals wore arrest placards for arrests in Queens, while others a county in New Jersey).

Chowdhury also does not explain why the arrest dates would "point[] the witnesses to Mr. Chowdhury." Chowdhury Mot. at 11. He claims that "a recent arrest date is . . . suggestive of criminality," id. at 12, but offers no reason as to why an arrest date closer in time to the administration of the photo arrays is "more suggestive of criminality" than any other arrest date or why the dates would unfairly lead the witnesses to choose his photograph as opposed to the other photographs. And in any case, as discussed above, all of the arrest dates were recent. This claim is especially uncompelling with respect to the June 14 photo array. For that array, John Doe-1 was attempting to identify the person who had kidnapped him on March 27. One could just as easily argue than an arrest date closer in time to the crime would be more "suggestive of criminality," and in fact, the photo array included two men with arrest dates just weeks before the kidnapping. See Chowdhury Mot., Ex. M.

C. The Identifications Were Independently Reliable

Because Chowdhury has proffered no valid reason why either photo array was unduly suggestive, that is the end of the inquiry. There is no reason to consider whether "an in-court identification may be independently reliable." Maldonado-Rivera, 922 F.2d at 973. Yet even if the Court did reach Chowdhury's claims that the identifications are not independently reliable, they should be rejected.

With respect to John Doe-2 and the May 22 photo array, Chowdhury provides only a single reason: "the witness indicated that he was only 50% confident in his identification." Chowdhury Mot. at 13. Chowdhury omits that John Doe-2 "immediately stated 'no' when shown the first two photos" before Chowdhury's, and that he "stated 'this one'" when shown Chowdhury's photo. Upon being "asked how confident [he] was in his identification," John

Doe-2 "said he was 50% sure." In reviewing the remaining photos, John Doe-2 "stated 'no' when shown" each one. Chowdhury Mot., Ex. I at 1. In other words, John Doe-2 fully rejected all five other photos of similar-looking men and identified Chowdhury on his first time seeing the photo, even if at a 50% confidence rate.

Chowdhury does not address any of the other four factors for determining the identification's reliability—factors that Chowdhury himself cites—all of which point to the identification's reliability. Chowdhury Mot. at 12-13 (citing Raheem v. Kelly, 257 F.3d 122, 135 (2d Cir. 2001)). Regarding "the opportunity of the witness to view the criminal at the time of the crime" and "the witness' degree of attention," John Doe-2's kidnapping was days long. As to "the accuracy of the witness' prior description of the criminal," a police summary documents John Doe-2's accurate description of Chowdhury only days after the kidnapping: "Iffat was accompanied by a Bengali male [whose] name was Chowdhury[,] however he kept calling himself 'The King of New York[.]' Chowdhury was medium build with a lot of facial hair." Ex. 6 (summary of May 14, 2023 police interview of John Doe-2) at EDNY _009398. John Doe-2 knew not only Chowdhury's physical description, but also his name and the identity of his romantic partner. As to "the length of time between the crime and the confrontation," mere weeks passed between the end of John Doe-2's kidnapping and the administration of the photo array.

With respect to John Doe-1 and the June 14 photo array, Chowdhury again provides only a single reason: "[T]he witness identified a second person in the photo array who 'looked like one of the other men who had beat him.'" Chowdhury Mot. at 13 (citing Ex. N). Chowdhury asserts that"[c]learly that was incorrect," and that this purported "clear inaccuracy" and the alleged "factors of suggestibility described above[] cannot give the Court confidence that

the identifications were independently reliable." Id. This single reason does not affect the reliability of John Doe-1's identification of Chowdhury as the man who "beat [him] with his fists and recorded a video of [him] naked" and who "took a pair of scissors and threatened [to] cut off [his] penis." Chowdhury Mot., Ex. N. It is not at all clear why Chowdhury believes John Doe-1's statement to be incorrect, much less why it affects his identification of Chowdhury. John Doe-1 stated only that this other photo "looked like one of the other men who had beat him." Chowdhury Mot., Ex. N. The government has alleged that multiple individuals were involved in the abduction of John Doe-1.[15] See, e.g., Ruhel Choudhury Detention Letter, at 2, ECF No. 189-1 (Apr. 22, 2024) (filed Nov. 19, 2024). It is entirely possible that one of John Doe-1's attackers "looked like" the individual in that particular photo. Moreover, John Doe-1's observation regarding that photo is different from his identification of Chowdhury in which he specifically said that the photo was "ABU" and signed it, rather than only indicating a resemblance. See Chowdhury Mot., Ex. N.

There is no serious question as to the independent reliability of John Doe-1's identification of Chowdhury because John Doe-1 knew Chowdhury prior to the kidnapping. John Doe-1 told law enforcement that he knew Chowdhury as one of the owners of BD Fresh grocery store. Chowdhury Mot., Ex. N. This was true: Chowdhury has admitted to the Court that he is the "part owner" of the "BD Fresh Market." Chowdhury Motion for Bond, ECF No. 33 at 2 (Aug. 3, 2023). The affidavit in support of the August 4 Warrant also reports that John Doe-1 " watched a video on social media in which [John Doe-1] identified Chowdhury

---

[15] Chowdhury's co-defendant Ahmed has also claimed that here were "many other individuals" present "while the crime was already in progress," Ahmed Motion to Modify Conditions of Release, at 1 n.1, ECF No. 198 (Dec. 12, 2024). Similarly, his co-defendant Razia has stated that she "was one of a number of community members" who came to John Doe-1's kidnapping. Razia Motion to Sever, at 1, ECF No. 259 (Apr. 15, 2025).

assaulting someone." Chowdhury Mot., Ex. J. ¶ 11. John Doe-1 was able to recognize Chowdhury "because he knew Chowdhury to be a member of the [redacted] community in Queens and to be an owner of BD Fresh." Id. ¶ 11. John Doe-1 "posted a video on social media directed at Chowdhury, telling Chowdhury that he was not afraid of him and challenging him to come find him in Hillside, Queens." Id. During the kidnapping, John Doe-1 "recognized one of the men to be Chowdhury." Id. ¶ 12. John Doe-1 clearly knew Chowdhury.

Despite all this, Chowdhury claims a hearing is necessary because "[t]he discovery [does not] indicate what physical description, if any, was given to law enforcement." Chowdhury Mot. at 13 n.10. That is not correct. The government produced to Chowdhury an NYPD complaint from shortly after the kidnapping, in which he named "UNK, ABBU" as one of his kidnappers and described him as a 5'11" male "ASIAN/PAC.ISL" with no accent, a dark skin tone, a clear complexion, and short black hair. Ex. 7 (John Doe-1 police complaint), at EDNY007832. This description is consistent both with Chowdhury's actual appearance and the photo shown in the array. John Doe-1 also provided a business address for Chowdhury that corresponded to BD Fresh market. Id. In any case, there is no need for a physical description when Chowdhury was personally known to John Doe-1 before the kidnapping because that personal knowledge means that his identification of Chowdhury was independently reliable.

Ultimately, there is no indication that either photo array meets the extremely high threshold for being unduly suggestive, and thus no reason to consider the independent reliability of the identifications. In any case, the factors for reliability for both victims weigh heavily in favor of admission.[16]

---

[16] The defendant also speculates as to purportedly unknown facts that could go to the identification's independent reliability: "the amount of time that the victim looked at each individual's face, the attention each witness paid to each photo, and as to the June identification,

IV. Chowdhury's Phones Were Lawfully Seized

Chowdhury's Phones were seized pursuant to well-established exceptions to the Fourth Amendment's warrant requirement: seizure incident to arrest and the inventory search. Chowdhury was lawfully arrested. See infra § Argument, IV.A. His Blue Phone was on his person, and law enforcement may lawfully seize a cell phone found on an arrested individual at the time of his arrest. See infra § Argument, IV.B.1-2. The unregistered vehicle with mismatched license plates that he was driving was lawfully impounded, and law enforcement was entitled to seize all items in the car—including his Red Phone—pursuant to an inventory search. See infra § Argument, IV.C.1-3.

A. Chowdhury Does Not Challenge the Traffic Stop or His Arrest

The government first notes that there is no factual or legal dispute as to the legality of the traffic stop, Chowdhury's arrest or the vehicle's impoundment. Chowdhury offered a sworn declaration regarding the traffic stop but does not dispute that he had run a stop sign, that he was driving with a suspended license, that the vehicle's license plate did not match the vehicle or that he was unable to produce any paperwork for the vehicle at the time of his arrest.[17] See Chowdhury Mot., Ex. A (Chowdhury Declaration); Chowdhury Mot., Ex. B at

---

the witness's certainty." But the record does show that John Doe-2 "immediately stated 'no'" with respect to the photos shown prior to Chowdhury's, Chowdhury Mot., Ex. I at 1, and that John Doe-1 "identified photo #3 and signed the photo," Chowdhury Mot., Ex. N. The defendant's speculation about what is not known does not raise any material questions of fact regarding the independent reliability of either witness—and the Court need not reach the issue of reliability at all because the photo arrays were not unduly suggestive.

[17] Chowdhury defends his failure to produce any paperwork for the vehicle on the ground that the police "knew at the time of the stop, that the car was in fact registered to Mr. Chowdhury." Chowdhury Mot. at 3 n.2 (citing Chowdhury Mot., Ex. D). New York law requires every driver, however, to provide a certificate of registration upon request to a police officer. NYVTL § 401(4). Chowdhury does not attempt to defend the other vehicular violations, and the same document cites to show that Chowdhury was the vehicle's registered owner also

EDNY_000010 (NYPD Arrest Report). Nor does Chowdhury move to suppress any of the evidence on the grounds that the traffic stop, arrest or impoundment were unlawful.[18]

B. Police Were Authorized to Seize the Blue Phone from Chowdhury's Person During a Lawful Arrest

1. Legal Standard

It is axiomatic that once arrested, a suspect may be subjected to a warrantless search incident to that arrest, see United States v. Robinson, 414 U.S. 1973), so long as the search is "substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest," Shipley v. California, 395 U.S. 818, 819 (1969). Law enforcement may seize property both on the arrestee's person and within his immediate vicinity. See United States v. Meregildo, 2012 WL 4378047, at *3 (S.D.N.Y. 2012) (finding that "iPhone and iPod touch [located] on top of a dresser within three feet of [arrestee] were within [his] immediate control and therefore properly seized incident to his arrest"). Law enforcement may seize a cell phone incident to a lawful arrest. See, e.g., United States v. Handler, No. 23 Crim 4 (JHR), 2023 WL 2584217 (S.D.N.Y. Mar. 21, 2023) (warrantless seizure of defendants' cell phones at time of their arrests "falls squarely within the [seizure incident to arrest] exception"). Although law

---

shows that the registration had expired in November 2022, Chowdhury Mot., Ex. D at EDNY_000019.

[18] The motion's Preliminary Statement and Background sections assert that the traffic stop was a "pretext," but the motion does not argue that the stop was therefore illegal. See Chowdhury Mot. at 1-3. Any such argument would be contrary to well-settled law: "The question of whether the stop was pretextual or not, however, is irrelevant to determining the arrest's validity. So long as the stop was lawful, the resulting arrest will not violate the Fourth Amendment." United States v. Thompson, 29 F.3d 62, 66 (2d Cir. 1994); see also United States v. Scopo, 19 F.3d 777, 784 (2d Cir. 1994) ("We, too, hold that where the arresting officer had probable cause to believe that a traffic violation occurred or was occurring in the officer's presence, and was authorized by state or municipal law to effect a custodial arrest for the particular offense, the resulting arrest will not violate the fourth amendment.").

enforcement may physically seize a cell phone incident to a lawful arrest, typically, a warrant is needed to search the phone's contents. See Riley v. California, 573 U.S. 373 (2014); United States v. Corbett, No. 20-CR-213 (KAM), 2021 WL 4480626, at *4 (E.D.N.Y. Sept. 30, 2021) ("Put simply, [under Riley], even if the officers were properly authorized to seize the defendants' phones incident to the defendants' arrests, the officers were obligated to obtain a warrant in order to search the phones.").

2. The Undisputed Facts Demonstrate That the Blue Phone Seizure Was Proper

Relying only on the undisputed facts, the seizure of the Blue Phone fits squarely within the seizure incident to arrest exception to the Fourth Amendment's warrant requirement. The Blue Phone was on Chowdhury's person at the time of his arrest; he was validly arrested; the police seized the Blue Phone at the time of his arrest; and it was not searched until a warrant was obtained. Accordingly, both the seizure and search of the Blue Phone were entirely proper, no hearing is necessary, and the defendant's motion to suppress evidence derived from the Blue Phone should be denied.[19]

3. Chowdhury Confuses the Seizure and the Search of Cell Phones

Chowdhury's argument to the contrary confuses permissible seizures with permissible searches. The government does not contend that law enforcement was authorized to search Chowdhury's Phones—to access the data on the phones—before obtaining a warrant. Nor does Chowdhury contend that the government did so. Nevertheless, Chowdhury disputes

---

[19] Chowdhury argues that there was no probable cause or exigent circumstances permitting the police to seize either phone. See Chowdhury Mot. at 15-20. As explained above, neither probable cause nor exigent circumstances is necessary to seize the defendant's property on his person. See supra § Argument, IV.B.1.

the seizure of the cell phones based on case law that addresses whether the government was authorized to search the phones incident to arrest.

Chowdhury incorrectly asserts that Riley v. California, 573 U.S. 373 (2014), created a "categorical ban" on seizing cell phones in connection with traffic stops. Chowdhury Mot. at 16. That is not what Riley holds. Riley concerned two separate cases in which police seized phones from the person of individuals at the time of their arrests, and officers searched the contents of their phones without first obtaining a warrant. See 573 U.S. at 378-80. The contested issue in Riley was the search of the contents of the defendants' phones. See 573 U.S. at 378 ("These two cases raise a common question: whether the police may, without a warrant, search digital information on a cell phone seized from an individual who has been arrested."). The Court held that the search incident to arrest did not apply to "searches of data on cell phones, and . . . that officers must generally secure a warrant before conducting such a search." Id. at 386. With respect to the issue here—seizing a phone from an arrestee's person—the Supreme Court found the issue uncontroversial: "Both [petitioners] concede that officers could have seized and secured their cell phones to prevent destruction of evidence while seeking a warrant. That is a sensible concession." Id. at 388 (citations omitted).

Nor does Arizona v. Gant, 556 U.S. 332 (2009), stand for the proposition that the police are not "entitled to search for and seize material on a driver's person or in his vehicle as evidence . . . when the arrest is for a traffic violation." Chowdhury Mot. at 15-16 (citing Gant, 556 U.S. at 343). In Gant police searched the defendant's vehicle after he had been arrested for driving with a suspended license, and the Court rejected that such a search of the defendant's

vehicle could be justified as a search incident to arrest. See Gant, 556 U.S. at 344. Gant is thus unrelated to the seizure of the Blue Phone which was on Chowdhury's person.[20]

4. Law Enforcement's Ability to Seize a Defendant's Personal Effects Does Not Depend on the Reason for the Traffic Stop

Chowdhury argues that police cannot seize a cell phone after arresting a defendant for a vehicular violation, but none of his cited case law supports this claim. For example, Chowdhury points to United States v. Rivera, 700 F. Supp. 3d 60 (S.D.N.Y. 2023). See Chowdhury Mot. at 16. The Rivera court found the seizure did not fall under the incident to arrest exception for two reasons: because the phone was taken from the defendant's vehicle after the defendant was "secured outside reaching distance of the passenger compartment," and because it was not evidence of the offense for which he was arrested. Rivera, 700 F. Supp. 3d at 84. Here, the Blue Phone was on Chowdhury's person, unlike the cell phone in Rivera which was left in a car after he was arrested. Because the phone was on his person at the time of his arrest, there is no requirement that the seized property be evidence of the offense of arrest. See supra §§ Argument, IV.B.1, 3.

Chowdhury also cites United States v. Herron for the claim that "law enforcement can only seize materials found in those search areas 'if the officers find that these are evidence of criminal conduct.'" Chowdhury Mot. at 15 (quoting United States v. Herron, 18 F. Supp. 3d 214, 229 (E.D.N.Y. 2014)). Critically, the word "only" is from Chowdhury's motion, and not the court in Herron. In fact, the court in Herron held that even though the defendant had been arrested for littering, the police were authorized "to seize the body armor along with Defendant's

[20] It is also irrelevant to the seizure of the Red Phone whose seizure was not based on the search incident to arrest exception, but rather the inventory search exception. See infra § Argument, IV.C.3.

other personal effects, at least for the duration of the custodial arrest."[21] Herron, 18 F. Supp. 3d at 224. The Herron court found no fault with the body armor's initial seizure when the defendant was arrested for littering. See id. Rather, the court faulted the government because it permanently seized the body armor without obtaining a warrant or otherwise showing probable cause to retain it. See id. at 224-29. Here, the government did obtain a search warrant to search the Blue Phone (as well as the Red Phone) after seizing it, and thus Herron's holding on warrantless permanent seizure is irrelevant.

In support of his claim that a "warrantless seizure of [a] defendant's cell phone after [a] car stop [is] unconstitutional," Chowdhury relies on two inapposite out-of-circuit cases. Chowdhury Mot. at 14. First, Chowdhury cites the Southern District of Iowa case United States v. Waldrip, No. 4:18-CR-163, 2019 WL 13143479, at *5-6, *8 (S.D. Iowa Apr. 3, 2019), but in Waldrip, there was no arrest. The defendant was released without arrest, and the government relied solely on the plain view and exigent circumstances exceptions. See id. at *1, *5. Here, Chowdhury was arrested, and neither of those exceptions is offered as the justification for the Blue Phone's seizure. Second, Chowdhury cites a 2023 District of Minnesota Report and Recommendation, United States v. Crutchfield, No. 22-CR-269, 2023 WL 3868710 (D. Minn. Mar. 21, 2023) (Report & Recommendation). The Report and Recommendation made clear that "the only such exception [to the warrant requirement] the Government invokes here" is exigent circumstances, and exigent circumstances was the only ground on which it analyzed the seizure of the defendant's cell phone. Id. at *3. In adopting the Report and Recommendation, the district court expressly refused to consider the government's argument that "the seizure was a

---

[21] As discussed below, if the property is initially seized lawfully, law enforcement may retain the property for a reasonable amount of time to obtain a warrant to search it. See infra § Argument, V.A.

valid search incident to [the defendant's] arrest" because "the government never made those arguments to [the magistrate judge]." United States v. Crutchfield, 2023 WL 3317992, at *1 & n.1 (D. Minn. May 9, 2023). Neither the Report and Recommendation nor the district court opinion adopting the Report and Recommendation supports Chowdhury's categorical claim that police cannot seize a defendant's cell phone after a car stop.

C. The Seizure of the Red Phone Was Proper

The Red Phone was also properly seized. The Red Phone was on the console of Chowdhury's vehicle at the time of his arrest. Chowdhury's vehicle was subject to impoundment because it was unregistered with a license plate that did not match any vehicle at all. Under standardized NYPD procedures, all the property in that vehicle was subject to temporary seizure during an inventory search, and police lawfully seized it as an inventory search. Even if the Court finds that the actual seizure of the Red Phone was not authorized, the phone would inevitably have been discovered during an inventory search.

1. Legal Standard

"It is well established that police have the authority, despite the absence of a warrant, to seize and remove from the streets automobiles in the interests of public safety and as part of their community caretaking functions—an authority that is beyond reasonable challenge." United States v. Lyle, 919 F.3d 716, 728 (2d Cir. 2019). The police are also authorized to conduct warrantless "inventory" searches of such seized, or impounded, vehicles. "Because an inventory search does not have a primarily investigatory purpose, it is not necessary for the search to be connected to the criminal conduct that caused the police to conduct an inventory search." Williams v. United States, No. 12-CR-726 (KMK), No. 17-CV-4317 (KMK), 2020 WL 1847966, at *6 (S.D.N.Y. 2020).

Inventory searches conducted pursuant to standard police procedures are reasonable. South Dakota v. Opperman, 428 U.S. 364, 372 (1976). The Second Circuit has "described the objectives of inventory searches as '(1) to protect the owner's property while it is in police custody; (2) to protect the police against spurious claims of lost or stolen property; and (3) to protect the police from potential danger.'" United States v. Williams, 930 F.3d 44, 54 (2d Cir. 2019) (quoting United States v. Lopez, 547 F.3d 364, 369 (2d Cir. 2008)). "Where police are potentially liable for property taken into custody, governmental interests justify inventory searches." United States v. Mundy, 806 F. Supp. 373, 376-77 (E.D.N.Y. 1992) (citing Colorado v. Bertine, 479 U.S. 367, 372–73 (1987)). Even if the impoundment of the vehicle stems partially from an investigatory motive, the search is still valid. See Lopez, 547 F.3d at 372; see also infra § Argument, IV.C.5.

The inventory search exception to the Fourth Amendment's warrant requirement is often coupled with the inevitable discovery exception to the exclusionary rule. When the government "invokes the inevitable discovery exception on the basis of inventory search procedures[,] . . . the court typically concludes that even if the invalid search had not been conducted, the evidence would nonetheless have been discovered in the course of a valid inventory search conducted pursuant to standardized, established procedures." United States v. Mendez, 315 F.3d 132, 138 (2d Cir. 2002). To show that the inevitable discovery doctrine applies in the vehicle inventory context, "the Government must prove three elements: '(1) that the police had legitimate custody of the vehicle or other property being searched, so that an inventory search would have been justified,' '(2) that when the police in the police agency in question conducted inventory searches, they did so pursuant to established or standardized procedures,' and '(3) that those inventory procedures would have inevitably led to the discovery

of the challenged evidence.'" United States v. Fabian, No. 16-CR-131 (DLI), 2019 WL 3578226, at *6 (E.D.N.Y. Aug. 8, 2019) (quoting Mendez, 315 F.3d at 138). "A court applying the doctrine determines, 'viewing affairs as they existed at the instant before the unlawful search [or seizure], what would have happened had the unlawful search [or seizure] never occurred.'" Rivera, 700 F. Supp. 3d at 73 (quoting Eng, 997 F.2d at 990) (alterations in original, emphasis in Eng and Rivera). "Proof of inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings." Rivera, 700 F. Supp. 3d at 73 (quoting Eng, 997 F.2d at 990).

2. Chowdhury's Vehicle Was Lawfully Impounded

The decision to impound Chowdhury's vehicle was reasonable. Chowdhury could not have driven the vehicle because he was both arrested and unlicensed. See People v. Walker, 980 N.E.2d 937, 939 (N.Y. 2012) (holding that it was "a reasonable procedure" to tow a vehicle whose operator has a suspended or revoked license). Moreover, because the car was unregistered with a non-matching license plate, it would be illegal for anyone to drive the car. See N.Y. Vehicle & Traffic Law § 401(1)(a) ("No motor vehicle shall be operated or driven upon the public highways of this state without first being registered . . . ."); United States v. Ruggiero, 824 F. Supp. 379, 394 (S.D.N.Y. 1993) (approving of impoundment where driver was unable to produce vehicle's registration); People v. Shepley, 185 A.D.2d 862, 863 (2d Dep't 1992) (approving of impoundment for van with expired registration); People v. Turner, 91 A.D.2d 646, 646 (2d Dep't 1982) (impoundment "proper" of "unregistered, uninspected and uninsured vehicle bearing improper plates"); People v. Robinson, 36 A.D.2d 375, 376 (2d Dep't 1971) (approving of impoundment for "unregistered, uninsured and uninspected" vehicle).

Under the totality of the circumstances, it was reasonable to impound Chowdhury's vehicle (and Chowdhury has not alleged otherwise). See Lyle, 919 F.3d at 731.

3. The Red Phone Was Lawfully Seized Pursuant to an Inventory Search

Importantly, the essential facts regarding the seizure of the Red Phone are undisputed: (1) the Red Phone was on the console of Chowdhury's vehicle at the time of his arrest, Chowdhury Mot. at 4, 17-18; Chowdhury Mot., Ex. A ¶ 11; Chowdhury Mot., Ex. F ¶ 22, and (2) it was seized after the police had determined the reasons for impounding Chowdhury's vehicle and after Chowdhury was arrested, see Chowdhury Mot. at 4, 17; Chowdhury Mot., Ex. A ¶¶ 9-12; Chowdhury Mot., Ex. F ¶ 22.[22] With the vehicle subject to impoundment and Chowdhury arrested, the vehicle was in NYPD custody, and the property in Chowdhury's vehicle was therefore also in NYPD custody. A vehicle becomes subject to an inventory search once it is in police custody. See, e.g., Rivera, 700 F. Supp . 3d at 73 ("Once police take custody of a vehicle, 'they may search the vehicle and make an inventory of its contents without need for a search warrant . . . .'" (quoting Lopez, 547 F.3d at 369)).

Police custody of the vehicle is the key point for the inventory search exception because of the purposes of an inventory search. An inventory search of the property in a seized, or impounded, vehicle safeguards the arrestee's property and protects the police from accusations related to the property. The Supreme Court has explained:

---

[22] Chowdhury alleges facts in his affidavit that are not in the law enforcement reports, principally that someone asked Chowdhury where his "'other phone' was" and that after his arrest Chowdhury asked police to give Lubna all of his property. Chowdhury Mot., Ex. A ¶¶ 10, 13. For the reasons explained in this section, however, verifying those claims is not necessary to resolve Chowdhury's motion: the Red Phone would have inevitably been discovered during a lawful inventory search even if no one had asked for it, and the police have no obligation to follow Chowdhury's commands regarding the disposition of his property during an inventory search.

> In [South Dakota v. Opperman, 428 U.S. 364 (1976) and Illinois v. Lafayette, 462 U.S. 640 (1983)], the police were potentially responsible for the property taken into their custody. By securing the property, the police protected the property from unauthorized interference. Knowledge of the precise nature of the property helped guard against claims of theft, vandalism, or negligence. Such knowledge also helped to avert any danger to police or others that may have been posed by the property.

Bertine, 479 U.S. at 373. The Supreme Court underscored that the police interest in protecting itself from accusations is key to the inventory search exception. Indeed, in response to the dissent's claim that the "danger" rationale was inapplicable here, the Court stated that such danger could include "the '[p]rotection of the police department' in the event that an individual later claims that 'there was something of value taken from the vehicle.'" Id. at 373 n.5 (quoting officer testimony) (alteration in original). Thus, once the NYPD had custody of the vehicle, an inventory search of the property in Chowdhury's vehicle served the related aims of protecting his property from loss or damage and the police from accusations of theft or damage.

The NYPD Patrol Guide contains a standardized procedure for "Inventory Searches of Automobiles and Other Property," whose purpose mirrors the Supreme Court's rationale for inventory searches: "To protect property, ensure against unwarranted claims of theft, and protect uniformed members of the service and others against dangerous instrumentalities." Ex. 8 (NYPD Patrol Guide, Inventory Searches of Automobiles and Other Property (Procedure No. 218-13)), at 1. This procedure requires an inventory search to be conducted "[w]henever any property comes into the custody of the [NYPD]."[23] Id.

---

[23] The Court may take judicial notice of the NYPD Patrol Guide and does not need to hold a hearing to determine its meaning, particularly here where its meaning is unambiguous. See Herman v. City of New York, No. 15-CV-3059 (PKC), 2022 WL 900592, at *13 n.14 ("The Court may take judicial notice of the Patrol [G]uide."); United States v. Zimmerman, 480 F. Supp. 3d 446, 451-52, 454 (E.D.N.Y. 2020) (denying defendant's request for a hearing, and relying on NYPD Patrol Guide).

Chowdhury's Red Phone, which was inside his vehicle at the time the NYPD took custody of the vehicle, was subject to that inventory search. It is of no matter that police took custody of it at the roadside rather than at the police station. The Second Circuit has held unambiguously: "Where officers have a right to impound a car, it does not matter whether the inventory search takes place on the street or at the police station." United States v. Henderson, 439 F. App'x 56, 58 (2d Cir. 2011); see also Jimenez v. City of Cohoes Police Dep't, No. 23-955, 2024 WL 1551149, at *3 (2d Cir. Apr. 10, 2024) (summary order) (holding, in Section 1983 context, that plaintiff had "not pleaded that the officers' conduct—searching the front and back seats and the trunk after they had told [plaintiff] that his passenger would not be able to drive the car home—is inconsistent with an inventory search"); United States v. Sobers, No. 17-CR-681 (ILG), 2018 WL 1936123 (E.D.N.Y. Apr. 24, 2018) ("Inventory searches are usually conducted at police stations, but the Fourth Amendment does not require that they be conducted at any particular location.").[24]

Lubna's decision to take the Red Phone out of the vehicle and provide it to the police also does not undermine the lawfulness of the Red Phone's seizure. As explained above, the Red Phone was in the vehicle when law enforcement took custody of the vehicle, and thus, required that it be included in the inventory search so that the NYPD could account for all of the vehicle's contents in accordance with NYPD policy and Supreme Court precedent. Lubna's providing the Red Phone to police and stating that it was Chowdhury's, see Chowdhury Mot.,

---

[24] As with the Blue Phone, Chowdhury disputes the Red Phone's seizure on the grounds that there was neither probable cause nor exigent circumstances justifying its seizure. See Chowdhury Mot. at 15-20. But neither probable cause nor exigent circumstances is required for an inventory search. To quote the Rivera decision—which Chowdhury cites: "Key to the Fourth Amendment analysis, impoundments and inventory searches do not need to be justified by probable cause, but only on a showing of reasonableness." Rivera, 700 F. Supp. 3d at 73.

Ex. F, merely provided additional confirmation that it was Chowdhury's property left behind in the impounded vehicle and thus was now in NYPD custody, and subject to an inventory search to "guard against claims of theft, vandalism, or negligence," Bertine, 479 U.S. at 373.

4. Police Were Authorized to Seize the Red Phone Regardless of Chowdhury's or Lubna's Requests for Its Return

The seizure of Chowdhury's Phones was lawful regardless of whether he consented to their seizure. Chowdhury asserts that "once [he] learned [he] was being arrested," he asked for "all of [his] property, including both of [his] phones" to be given to Lubna.[25] Chowdhury Mot., Ex. A ¶ 13. The affidavit in support of the initial search of Chowdhury's Phones also states that Lubna requested the return of the Red Phone after "Chowdhury began speaking in another language to [her]."[26] Chowdhury Mot., Ex. F ¶ 22. Police were not obligated to follow these requests.

Law enforcement's authority to seize property pursuant to an inventory search does not rest on the defendant's consent. See Adeleke v. Johnson, No. 20-CV-5224 (MKB), 2022 WL 4226042, at *6 (E.D.N.Y. Sept. 13, 2022) (rejecting, in Section 1983 suit, plaintiff's argument as to unlawful search on ground that he did not consent to his cell phones' seizure at the time of his arrest because their seizure was the "valid result of a lawful inventory search"); Williams, 2020 WL 1847966, at *6 ("Consent is not required for a valid inventory search. . . . [T]he purpose of an inventory search is to protect the owner's property and safeguard the police

[25] Because Chowdhury's consent or lack thereof does not change whether Chowdhury's Phones were lawfully seized, the Court need not hold a hearing to investigate his claim.

[26] Because Chowdhury's lack of consent to the seizure of his own phones does not affect the lawfulness of their seizure, a fortiori Lubna's objections do not affect the lawfulness of their seizure.

from danger or accusations of theft."). When an arrested individual's property is subject to an inventory search, that arrested individual does not decide whether the government inventories the property. The Supreme Court recognized this in Bertine. The court below had "expressed the view that the search in this case was unreasonable because Bertine's van was towed to a secure, lighted facility and [the arrestee] could have been offered the opportunity to make other arrangements for the safekeeping of his property." Bertine, 479 U.S. at 373. The Supreme Court expressly rejected that the police have any obligation to accommodate such requests:

> But the security of the storage facility does not completely eliminate the need for inventorying; the police may still wish to protect themselves or the owners of the lot against false claims of theft or dangerous instrumentalities. And while giving [the arrestee] an opportunity to make alternative arrangements would undoubtedly have been possible, we said in Lafayette: '[T]he real question is not what "could have been achieved," but whether the Fourth Amendment requires such steps . . . 'The reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative "less intrusive" means.'"

Id. at 373-74 (quoting Lafayette, 462 U.S. at 647) (alterations to Lafayette in original).[27] Bertine's analysis is directly on point here. Just as "the security of the storage facility does not completely eliminate the need for inventorying," so too giving the Red Phone (or Blue Phone, for that matter) to Lubna would not "completely eliminate the need for inventorying." Id. at 373.

---

[27] The Second Circuit has reached a closely analogous result in refusing to allow an arrestee to direct the disposition of his vehicle when impounded. In Lyle, 919 F.3d at 731, the defendant "asked for the opportunity to arrange for his girlfriend" to take the vehicle he had been driving, rather than the police impounding the vehicle, but the Second Circuit held that "the police were not required to grant the request." See also Rivera, 700 F. Supp. 3d at 80 ("Rivera argues that officers should have given him the opportunity to try to locate a third party to take custody of the van. But, as Lyle instructs, the officers did not have such a duty."); cf. People v. Walker, 980 N.E.2d 937, 939 (N.Y. 2012) (police not required to inquire as to whether third party could drive defendant's vehicle rather than impound defendant's vehicle). The same principle would apply here. Considering the purposes of an inventory search, an arrestee would have no greater right to direct the disposition of his property inside his vehicle than he would the vehicle itself.

In both cases, the alternative arrangement may "have been possible," but that does not make it required under the Fourth Amendment. Id. at 374. Under NYPD policy and Supreme Court precedent, the officers were permitted to inventory the vehicle and all of its contents for safekeeping as soon as it was in their custody.

The decision in United States v. Cancel, 167 F. Supp. 3d 584 (S.D.N.Y. 2016), is instructive. The defendant there challenged a search of his bag during his arrest. See id. at 588-89. The court determined that the guns would have been inevitably discovered during an inventory search. See id. at 596; see also infra § Argument, IV.C.6 (inevitable discovery doctrine applied to Red Phone). The defendant contended that discovery was not inevitable because "the officers 'could have permitted a family member or friend to retrieve [the defendant's] belongings at the precinct.'" Cancel, 167 F. Supp. 3d at 596 (quoting defendant's brief). The court rejected this argument in part based on the testimony of two NYPD officers "that it would be inconsistent with NYPD procedures to give the property of an arrested individual to a family member or friend in lieu of inventorying the property." Id. In particular, the court quoted one officer's testimony that, "It has been my experience to properly voucher that person's belongings and not give them to anyone that is on the scene." Id. (emphasis added). Just so here, the police had no obligation, by law or NYPD policy, to follow the defendant's purported direction and to give Chowdhury's Phones to Lubna rather than invoice them. In reality, NYPD policy requires that property in the NYPD's custody be searched and invoiced. See Ex. 8 at 1. The Cancel decision, the NYPD policy and the events here are all consistent with the Supreme Court's holding in Bertine that law enforcement may "secur[e] the property" of an arrestee to "protect the property from unauthorized interference" and "guard against claims of theft, vandalism or negligence." Bertine, 479 U.S. at 373.

5. The Officers' Subjective Intent Is Irrelevant in the Inventory Search Context

Chowdhury states that police "determined to surveil Mr. Chowdhury until he committed a traffic offense [and] use that as a pretext to take his phones." Chowdhury Mot. at 28. Chowdhury claims that this was "an improper 'stratagem' to obtain evidence 'without a warrant.'" Id. at 28 (citing United States v. Eisenberg, 707 F. Supp. 3d 406 (S.D.N.Y. 2023)).[28] However, binding Second Circuit precedent and several district court decisions hold that an otherwise valid inventory search is proper no matter the police's actual or alleged investigatory motives. See Lopez, 547 F.3d at 372 ("When officers, following standardized inventory procedures, seize, impound, and search a car in circumstances that suggest a probability of discovering criminal evidence, the officers will inevitably be motivated in part by criminal investigative objectives. Such motivation, however, cannot reasonably disqualify an inventory search that is performed under standardized procedures for legitimate custodial purposes."); Rivera, 700 F. Supp. 3d at 75 ("[W]hen circumstances suggest a probability of discovering criminal evidence, courts recognize that officers will inevitably be motivated in part by criminal investigative goals. 'Such motivation, however, cannot reasonably disqualify an inventory search that is performed under standardized procedures for legitimate custodial purposes.'" (quoting Lopez, 547 F.3d at 372)); Zimmerman, 480 F. Supp. 3d at 455 ("Even if the officers, based on their experience, harbored a belief that the fuse box might contain valuables or even contraband, that alone is not sufficient to find that the officers conducted the search in bad faith. As noted above, the vehicle was properly impounded, and the officers were entitled to conduct a thorough inventory search of any and all areas . . . ."); Fabian, 2019 WL 3578226, at *6 ("On its

---

[28] Notably, in the case that the defendant cites for this proposition, Eisenberg, the court denied the motion to suppress and found no bad faith. See 707 F. Supp. 3d at 417.

own, a law enforcement officer's mere expectation of finding evidence will not invalidate an inventory search."); United States v. Wallace, 2016 WL 4367961, at *10 (S.D.N.Y. August 11, 2016) ("The Court finds that the legality of the otherwise reasonable inventory search conducted by [the] officers . . . was not altered by any investigatory motive the officers may have possessed."); Bryant v. Vill. of Greenwood Lake, No. 11-CV-7788, 2013 WL 5952610, at *4 (S.D.N.Y. 2013) ("An otherwise-reasonable inventory search will not be rendered unreasonable merely because an officer is motivated in part by investigatory purposes or by the expectation that the search will yield evidence."); cf. United States v. Fayton, 697 F. Supp. 3d, 179, 192 (S.D.N.Y. 2023) ("Even if, as Defendant speculates, the officers had some sort of ulterior motive when arresting Defendant for the various traffic violations, suppression is not warranted because the officers' actual motivation is 'irrelevant.'" (quoting United States v. Lucas, No. 2019-3937-CR, 2021 WL 3700944, at *1 n.1 (2d Cir. Aug. 20, 2021)). An officer's investigatory motive in conducting an inventory search does not constitute bad faith. Lopez, 547 F.3d at 372.

In evaluating the reasonableness of an inventory search, the Second Circuit in United States v. Williams held that "the officer's subjective purpose" is not the proper inquiry, but rather the "purpose of the administrative program itself." 930 F.3d at 56 (quoting Brigham City v. Stuart, 547 U.S. 398, 405 (2006)) (emphasis in original). There can be no serious question that the purpose of the NYPD's inventory search program itself is proper considering its alignment with Supreme Court precedent, see supra § Argument, IV.C.4, and the substantial number of cases upholding NYPD inventory searches in the Second Circuit (including Williams) and the Eastern and Southern Districts.

6. The Red Phone Is Subject to the Inevitable Discovery Doctrine

The Red Phone was lawfully seized pursuant to the inventory search exception. Yet even assuming arguendo that the Red Phone's seizure was unlawful, the government would

inevitably have discovered and seized the Red Phone during an inventory search, and thus there is no basis to suppress the Red Phone. See Mendez, 315 F.3d at 138.

The undisputed facts show that all three elements of inevitable discovery are met here. See Fabian, 2019 WL 3578226, at *6. First, the police had legitimate custody of the vehicle because there was a lawful traffic stop, and the vehicle was reasonably impounded. See supra § Argument, IV.C.2. Second, the NYPD maintained standardized procedures for the conduct of inventory searches. See Ex. 8. Third, "those inventory procedures would have inevitably led to the discovery of the challenged evidence." Fabian, 2019 WL 3578226, at *6 (quoting Mendez, 315 F.3d at 138). The NYPD's inventory search policy requires that police "[s]earch the interior of vehicle thoroughly" to "include any area that may contain valuables including, but not limited to: . . . (2) Console . . . ." Ex. 8 at 1. Chowdhury himself has sworn that the Red Phone was on the vehicle's console. See Chowdhury Motion, Ex. A ¶ 11. A search in accord with this policy would thus have discovered the Red Phone. See United States v. Harris, 636 F. Supp. 3d 319, 328-29 (E.D.N.Y. 2022) (holding that even if firearm hidden in fuse box had not been seized during traffic stop, it would inevitably have been discovered during inventory search conducted pursuant to NYPD Patrol Guide); Cancel, 167 F. Supp. 3d at 597 ("Had the two officers 'not found the evidence during the earlier search, they would inevitably have found it in the course of a valid inventory search, which [they] would subsequently have made.'" (quoting Mendez, 315 F.3d at 138-39) (alteration in original)). And although the police took custody of the Red Phone at the roadside when Lubna handed it to them, an inventory search of the vehicle was ultimately conducted and documented. Just like Chowdhury's Phones, the vehicle and the other property in the car were also vouchered, and when the property other than the phones was returned, a record was kept of that return. See Chowdhury Mot., Ex. G

(invoice for phones); Ex. 3 (invoice for vehicle); Ex. 4 (invoice for vehicle's other property); Ex. 5 (record of property's return). If the Red Phone had not been collected from Lubna, it would have been found pursuant to standard NYPD procedures during that inventory search which actually occurred.

V. Law Enforcement Timely Obtained a Search Warrant

Lastly, Chowdhury argues that the FBI unreasonably delayed in seeking a warrant to search the Blue and Red Phones. This argument is without merit, as there was no unreasonable delay, and even if there were, the exclusionary rule would not apply.

A. Legal Standard

Police may seize a cell phone incident to arrest, though they may not search the data on that phone without first obtaining a warrant. See supra § Argument, IV.B.1-2. Law enforcement may continue to hold property seized from an arrested individual's person while they obtain a warrant. See Adeleke, 2022 WL 4226042, at *5. For example, in United States v. Corbett, the defendants' cell phones "were seized incident to their arrests" "[a]t the time of their arrests." 2021 WL 4480626, at *1. The defendants did "not challenge the circumstances of the seizures of their cell phones," id. at *2, and Judge Matsumoto observed that the Supreme Court's Riley decision "permits the warrantless seizure of a cell phone incident to arrest, but requires a warrant to search it," id. at *4 (emphasis in original).

The Second Circuit's decision in United States v. Smith, 967 F.3d 198 (2d Cir. 2020), provides a four-part test to evaluate the reasonableness of the amount of time it takes the government to apply for such a warrant. In Smith, law enforcement officers found the defendant in the driver's seat of a car, unconscious and apparently intoxicated, and seized a tablet on the front passenger seat that appeared to contain child pornography. See id. at 202-03. The Second Circuit held that a month-long delay between this warrantless seizure of the tablet and the

government's application for a search warrant was unreasonable and violated the Fourth Amendment. See id. at 211.

Despite finding a violation of the Fourth Amendment, the court declined to apply the exclusionary rule because the court was "no evidence to indicate any deliberate, reckless, or grossly negligent disregard for [the defendant's] rights"; the "delay did not afford the police any strategic advantage in [the defendant's] case"; and "the record [does not] show systemic or recurring negligence by [the warrant's affiant] or any of the investigative agencies involved in this case." Id. at 212. Noting, inter alia, that a delay of one month or more is ordinarily too long for an officer to apply for a warrant, the Smith court directed courts going forward to consider four factors in assessing whether an unreasonable amount of time has passed in seeking a search warrant: (1) "the length of the delay," (2) "the importance of the seized property to the defendant," (3) "whether the defendant had a reduced property interest in the seized item," and (4) "the strength of the state's justification for the delay." Id. at 206.

B. Nine Days Is a Reasonable Period of Time to Obtain a Search Warrant

As described above, on Wednesday, May 31, 2023, the government lawfully seized the Blue Phone in the course of a search incident to arrest, see supra § Argument, IV.B.2, and the Red Phone in an inventory search, see supra § Argument, IV.C.3. The government then timely applied for a search warrant for Chowdhury's Phones on June 9, 2023. See Chowdhury Mot., Ex. F. The Smith factors all either favor the government or are neutral.

The "length of the delay"—the first Smith factor—was in fact not at all lengthy. The FBI obtained a warrant in nine calendar days. Substantial case law suggests that the court should exclude or at least discount weekends, reducing the time to only seven days. See United States v. Martin, 157 F.3d 46, 54 (2d Cir. 1998) ("the eleven day delay included two weekends and the Christmas holiday, which could explain the difficulty in promptly obtaining the

warrant"); United States v. Watson, No. 23-CR-82 (EK), 2023 WL 7300618, at *9 (E.D.N.Y. Nov. 6, 2023) ("Six of these days were weekends and therefore may be discounted."); United States v. Hiya, No. 24-CR-282 (VM), 2024 WL 5004586, at *4 (S.D.N.Y. Dec. 6, 2024) (calculating time using business days); United States v. Wells, No. 20-CR-633 (NRB), 2023 WL 2223474, at *3 (S.D.N.Y. Feb. 23, 2023) ("[T]he Court is reluctant to 'tax the responsible officer for the days he was scheduled not to work . . . .'" (quoting Smith, 967 F.3d at 217 (Kearse, J., concurring))); United States v. Kamaldoss, No. 19-CR-543 (ARR), 2022 WL 1200776, at *16 (E.D.N.Y. Apr. 22, 2022) (considering impact of "two weekends" on "fifteen-day delay"). Nine calendar days, or seven business days, is comfortably within the delays that courts in this circuit have found reasonable. See Martin, 157 F.3d at 54 (11 days, including two weekends and Christmas," was not "so 'unreasonable' as to violate the Fourth Amendment"); Tr. of Crim. Cause for Status Conf. at 16:17-19, United States v. Franco, No. 23-CR-394 (DG) (E.D.N.Y. Oct. 15, 2024) ("As to the first factor, the delay was 17 calendar days and 13 business days. I find that factor to be at worst neutral on the facts of this case."); Hiya, 2024 WL 5004586, at *4 (delay of nine business days was neutral factor); Watson, 2023 WL 7300618, at *9 (delay of 19 calendar days—13 business days—"weighs in favor of neither the government nor the defendant"); Kamaldoss, 2022 WL 1200776, at *16 (15-day delay including two weekends "should not weigh against the government"); Adeleke, 2022 WL 4226042, at *6 n.8 ("[B]etween the May 29 Arrest and June 11, 2018, when Officer Johnson applied for the warrant, only thirteen days had passed. This constitutes 'a reasonable period of time.'" (quoting Martin, 157 F.3d at 54)); cf. Wells, 2023 WL 2223474, at *3 (delay of 29 calendar days favors defendant "only to a slight degree").

Indeed, although Chowdhury claims that "the length of the delay here . . . is longer, perhaps 'considerably' longer, that what the Second Circuit has said it 'would normally expect,'" Chowdhury Mot. at 22 (quoting Martin, 157 F.3d at 54), Chowdhury does not cite even a single case in this circuit in the 27 years since Martin which holds that a delay of nine calendar days or fewer was held to be an unreasonable delay, much less one in which a warrant was suppressed based on a nine-calendar-day delay.[29] This substantial case law demonstrates that the length of time that the government took to apply for a warrant here was not unreasonable.

None of the other three Smith factors sufficiently outweigh the short length of delay to render it unreasonable.[30] As to the importance of the seized property to Chowdhury, this factor is neutral. While Chowdhury's Phones may be important to him, their seizure did not "effectively restrain the liberty interests of [Chowdhury], as is the case where officers seize a traveler's luggage." Martin, 157 F.3d at 54. Moreover, although Chowdhury proffers some uses for his seized phones, Chowdhury Mot., Ex. A ¶ 20, Chowdhury "does not specify which phone held which information," Wells, 2023 WL 2223474, at *9, or whether he had "alternative electronic devices that could serve the same function," Smith, 967 F.3d at 208.

[29] Chowdhury cites only two out-of-circuit cases in which delays of nine or fewer days were found unreasonable. See Chowdhury Mot. at 24. The first is a 37-year-old Ninth Circuit decision which concerned multiple warrants applied for between seven and 23 days after seizure. See United States v. Dass, 849 F.2d 414, 415 (9th Cir. 1988). The second is a 2019 Southern District of Iowa case in which the court also found that the police had no authority to seize the defendant's cell phone in the first place. See Waldrip, 2019 WL 13143479, at *5-6. Chowdhury's reliance on just two isolated, out-of-circuit cases with materially different facts over the past 37 years demonstrates that nine calendar days here were reasonable.

[30] To the extent Chowdhury disputes any of the remaining Smith factors on factual grounds, there is no need for a hearing to resolve such disagreements for two independent reasons: First, the short delay here—a delay so short that Chowdhury does not cite a single case in which it has been found unreasonable—makes the other three factors immaterial. Second, even if the Court found that the delay was unreasonable, the exclusionary rule does not apply in any case. See infra § Argument, VII.B.

The third factor—whether Chowdhury had a reduced property interest—favors the government for at least two reasons. The government lawfully seized Chowdhury's Phones. See Corbett, 2021 WL 4480626, at *1, *6 (holding that third factor favors government in part because of "the officers' authority to lawfully seize the phones incident to arrest"). Also, as the ultimate issuance of the June 9 Warrant shows, the government had probable cause to search Chowdhury's Phones. See Wells, 2023 WL 2223474, at *5.

The final factor weighs in the government's favor. Chowdhury's Phones were seized in the initial weeks of a rapidly moving ongoing investigation into a serious kidnapping. Courts routinely consider the ongoing nature of an investigation in justifying a delay. See, e.g., Corbett, 2021 WL 4480626, at *6 ("[T]he court finds that the delay was reasonable in light of the government's continuing investigation."); Wells, 2023 WL 2223474, at *6 (justification favors government in part because government's "continued investigatory work . . . show[s] that they exercised some degree of overall diligence" (quoting United States v. Green, No. 18-CR-121 RJA, 2021 WL 1877236, at *8 (W.D.N.Y. Feb. 3, 2021))). The pace and scale of the investigation are demonstrated by, for example, the fact that only five days after the June 9 Warrant was obtained for the John Doe-2 kidnapping, the government was already interviewing John Doe-1 about his separate kidnapping, see Chowdhury Mot., Ex. N.

Accordingly, the Smith factors, particularly the length of the delay itself, show that the delay here did not violate the Fourth Amendment. Furthermore, as explained in greater detail below, see infra § Argument, VII.B, even if the Court found that the delay here did violate the Fourth Amendment, there is still no basis to exclude the evidence from Chowdhury's Phones because Chowdhury has proffered no "evidence that the officers' delay in obtaining a search warrant was deliberate, reckless, or grossly negligent." Corbett, 2021 WL 4480626, at *7.

VI. The Government Did Not Exceed the Scope of the Blue Phone Search Warrant

Chowdhury infers that the government exceeded the scope of the June 9 Warrant when it discovered evidence of the kidnapping of John Doe-1 on the Blue Phone, but Chowdhury's inference is based on a factual misunderstanding. The evidence was uncovered in plain view, and even if the Court found otherwise, the good-faith exception would apply.

The government notes that Chowdhury's argument refers to a search of the Red Phone that exceeded the warrant's scope. See Chowdhury Mot. at 6, 24-25. However, the search to which Chowdhury refers was actually of the Blue Phone. The August 4 Warrant indicates that the evidence was uncovered on "SUBJECT PHONE-1," which was the Blue Phone. Chowdhury Mot., Ex. J ¶¶ 4, 24.

A. Legal Standard

"[L]aw enforcement officers may seize evidence in plain view, provided that they have not violated the Fourth Amendment in arriving at the spot from which the observation of the evidence is made." Kentucky v. King, 563 U.S. 452, 462-63 (2011). The plain view exception authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." United States v. Gamble, 388 F.3d 74, 76 (2d Cir.2004) (internal quotation marks omitted). The plain view exception also applies when law enforcement reviews digital evidence pursuant to a search warrant. See, e.g., United States v. Barrett, No. 23-CR-623 (JLR), 2025 WL 371084, at *22 (S.D.N.Y. Feb. 3, 2025); United States v. Raniere, No. 18-CR-204-1 (NGG), 2019 WL 1984026, at *4 (E.D.N.Y May 3, 2019).

B. Law Enforcement Discovered Evidence of John Doe-1's Kidnapping in Plain View

The investigating agent discovered the photo of John Doe-1 in plain view. He described the circumstances of the photo's discovery in a Form 302 written the day it was discovered and then again in the affidavit for the August 4 Warrant.[31] He manually unlocked the Blue Phone by guessing the passcode. See Ex. 9 (July 13, 2023 Form 302 re Search of Blue Phone), at 1. He opened the "Photos" application to look for photos dated between May 11 and 13. See id. The June 9 Warrant permitted him to open the application to look for photographs and videos. Chowdhury Mot., Ex. F at EDNY_000146 (authorizing seizure of photographs and videos from Chowdhury's Phones). Upon opening the application, there were four photo albums visible under the "My Albums" header. See Ex. 9 at 1, 3. One album was entitled "M," which is John Doe-1's first initial. See id. The "M" album appeared to contain 22 photos and featured a clear thumbnail photo of John Doe-1 in a car in front of a masked individual wearing black gloves. See id.; see also Chowdhury Mot., Ex. J ¶ 24. The agent did not open the "M" album; notably, the affidavit for the August 4 Warrant relied only on the single thumbnail photo. See Chowdhury Mot., Ex. J ¶ 24. The agent took a picture of the "Photos" application showing the picture of John Doe-1. See Ex. 9 at 3.

Under these circumstances, the plain view exception applies. First, the investigating agent's "access to the object has some prior Fourth Amendment justification," Gamble 388 F.3d at 76, because he came across the image during the proper execution of a judicially authorized search warrant. Second, he had "probable cause to suspect that the item is connected with criminal activity." Id. As noted in the affidavit for the August 4 Warrant, the

[31] The investigating agent's Form 302 documenting the search was drafted on July 12, 2023 (the day of the search) with a "Date of entry" the following day. Ex. 9 at 1.

investigating agent was able to recognize John Doe-1 because he had a "face-to-face interview with [him] . . . for approximately three hours" in which John Doe-1 discussed "the kidnapping." Chowdhury Mot., Ex. J ¶ 24; see also id. ¶¶ 10-14 (describing John Doe-1's kidnapping).

Chowdhury disputes that the photos of John Doe-1 could have been discovered in plain view because the photos of John Doe-1 all had dates outside the scope of the June 9 Warrant. Chowdhury Mot. at 26. This argument assumes that the agent discovered the photo when using "[f]orensic search tools" that could have "limit[ed] the scope of files reviewed on electronic devices, including by date of creation." Id. at 26. That is not the case, however. At the time of the search, the FBI was "unable to extract data" due to the new operating system that the Blue Phone was running, and "only a manual search of the data [was] feasible." Ex. 9 at 1.

Although Chowdhury is mistaken about the nature of the search, there is no basis for an evidentiary hearing. Chowdhury's alternative version of events was based on an incorrect assumption regarding the search methods available to and used by the FBI at the time of the photo's discovery. It does not create a "specific, detailed, and nonconjectural" factual issue to be resolved. In re Terrorist Bombings, 552 F.3d at 165. There is no need "for a hearing to determine if the materials seized were truly in 'plain view' of officers conducting the searches" because the Court "has sufficient information from the warrants and underlying affidavits to resolve [Chowdhury's] suppression motion." Barrett, 2025 WL 371084, at *22.

## VII. There Is No Basis to Suppress Evidence from Chowdhury's Phones

There was no constitutional violation with respect to the Phone Warrants. Chowdhury's Phones were lawfully seized; the government timely obtained the June 9 Warrant to search them; and after discovering further evidence in plain view, the government obtained the August 4 Warrant to expand the search. Even if the Court found fault at one or more of these steps, the exclusionary rule would not apply.

A. Legal Standard

Even if the Court finds a violation of the Fourth Amendment, evidence is not automatically suppressed. Rather, "the exclusionary rule applies only if the police have violated the Constitution deliberately, recklessly, or with gross negligence, or if a constitutional violation is the product of recurring or systemic negligence." Smith, 967 F.3d at 211. "[T]he application of the exclusionary rule is not appropriate for isolated simple negligence . . . ." Id. at 211-212.

B. There Is No Evidence of Police Misconduct

As described above, each step of the seizures and searches here was lawful, but even if the Court found that some aspect violated the Fourth Amendment, suppression is not warranted because Chowdhury does not assert a single specific fact to meet this difficult standard. See Chowdhury Mot. at 27-29. Rather, Chowdhury simply rehashes the alleged violations and makes ipse dixit claims that they were "sufficiently obvious and deliberate" "violations of Mr. Chowdhury's constitutional rights." Id. at 28. These allegations do not withstand scrutiny. For example, Chowdhury cites the inapt Crutchfield and Waldrip decisions again, see id. at 27, neither of which even considered the Fourth Amendment exceptions applicable here (i.e., seizure incident to arrest and inventory searches). Chowdhury also cites Martin as to the amount of time that elapsed before the government obtained a warrant, see Chowdhury Mot. at 28, but it is farfetched to claim that nine calendar days to obtain a search warrant requires suppression when Chowdhury does not cite a single case in this circuit that has found suppression on such grounds. Indeed, multiple courts have found that longer delays did not even violate the Fourth Amendment, much less require suppression. See supra § Argument, V.B (collecting cases in which delays of nine to 19 calendar days are considered reasonable or neutral). Like the Second Circuit did in Smith, other courts in this circuit have also held that even if delays (which were longer than the one here) did violate the Fourth Amendment, such

delays still did not merit suppression because there was no "evidence that the officers' delay in obtaining a search warrant was deliberate, reckless, or grossly negligent." Corbett, 2021 WL 4480626, at *7; see also Watson, 2023 WL 7300618, at *11 (even if 19-day delay violated the Fourth Amendment, "suppression would not be unwarranted").

Chowdhury claims that "the record reflects a collection of violations that was . . . more likely the product of an improper 'stratagem' to obtain evidence 'without a warrant.'" Chowdhury Mot. at 28 (quoting Eisenberg, 707 F. Supp. 3d at 416).[32] Of course, the government here did obtain search warrants for Chowdhury's Phones. To show this "improper 'strategem,'" Chowdhury appears to rely only on the cumulative effect of the alleged constitutional violations.[33] Not only is Chowdhury wrong on the violations themselves, but even if he were correct, there is no specific allegation that would show how these were more than "isolated simple negligence."

Additionally, the evidence from Chowdhury's Phones is also admissible for a separate and independent reason. They were subject to the inevitable discovery doctrine because "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." United States v. Whitehorn, 829 F.2d 1224, 1230 (2d Cir. 1987) (quoting Nix v. Williams, 467 U.S. 431, 444 (1984). The probable cause set forth in the June 9 Warrant does not rely on any information learned from the seizures

---

[32] Notably, the case that Chowdhury cites for this proposition held that a cell phone was lawfully seized incident to arrest; that even if the seizure had been unlawful, the phone would have inevitably been discovered during an inventory search; and that the good-faith exception applies after a 23-day delay to obtain a search warrant. See Eisenberg, 707 F. Supp. 3d at 411, 412, 416.

[33] To the extent Chowdhury relies on the allegedly "pretextual" nature of the car stop to allege a deliberate constitutional violation, see Chowdhury Mot. at 28, that argument has been roundly rejected, see supra note 17.

of Chowdhury's Phones that he alleges were unlawful. Without these seizures, the June 9 Warrant would still have been obtained, and the government still would have seized Chowdhury's Phones pursuant to such a warrant and obtained the same evidence.[34]

## VIII. An Evidentiary Hearing Is Unnecessary As to Both Defendants Because There Are No Material Issues of Fact in Dispute

There is sufficient evidence in the record for the Court to deny Chowdhury's and Lubna's motions without a hearing because neither defendant has raised a material fact in dispute that would warrant suppression. With respect to Lubna's motion, she raises a legal objection that law enforcement violated her right to silence but does not contest any of the factual underpinnings that surround her statement. See supra § Argument, I.C. With respect to Chowdhury, although he has submitted an affidavit with his account of the car stop that led to the seizure of his cell phones, he still fails to set forth a fact that, if true, would require suppression. See United States v. Hassan, No. 18-CR-603 (ARR), 2019 WL 5684367, at *4 (E.D.N.Y. Nov. 1, 2019) (denying motion to suppress without hearing because defendant's affidavit, "even if assumed to be true, would not require suppression" (quoting United States v. Getto, 729 F.3d 221, 226 n.6)). Chowdhury's motion objects to (1) the seizure of Chowdhury's Phones; (2) the timeframe in which the government obtained a search warrant for Chowdhury's Phones; (3) execution of the search of the Blue Phone; and (4) the photo arrays administered to John Doe-1 and John Doe-2. As discussed in greater detail in each individual section, Chowdhury does not contest any of the essential facts underlying the lawfulness of the government's actions in each case. In sum, the parties agree as to the underlying and material facts that led to the seizures and

---

[34] This argument applies to both of Chowdhury's Phones and is separate from the government's explanation above about the particular application of the inevitable discovery doctrine to the Red Phone in the inventory search context. See supra § Argument, IV.C.6.

searches of Chowdhury's Phones. Chowdhury's motions must, therefore, be denied without a hearing. See Chandler, 164 F. Supp. 3d at 376 ("[I]f facts urged in support of a hearing would not entitle the moving party to relief as a matter of law, no evidentiary hearing is required.") (quotation marks and citation omitted). For both defendants, the record is plainly sufficient with evidence for this Court to address their claims, which should be denied in their entirety.

## IX. Razia's Motion for *Brady* Disclosures Should Be Denied

Razia argues that the government should provide several items she believes qualify as Brady materials: "(1) any and all social media, including but not limited to 'Tik Tok' videos and other social media posts prepared or published by [John Doe-1] which refer to our client Sultana Razia or any other person involved as a defendant or witness in this case or which may be fairly said to disparage anyone, witness or not; (2) any and all social media, including but not limited to 'Tik Tok' videos and other social media posts prepared or published by [John Doe-1] which refer to Sultana Razia or any other person, where [John Doe-1] claims that such person owes him money; and (3) any and all reports or records of the NYPD with respect to the communications referred to in items 1 and 2, above." Razia Mot. at 1-2. Razia also demands that the government state "what if any social media records of [John Doe-1] have been subpoenaed or obtained by the Government and whether the Government is seeking or intends to seek any such records." Although the government does not concede that the items sought in Razia's Motion would qualify as Brady material, it nonetheless is not in possession of any of these items and has no obligation to produce items not in its possession.

### A. Applicable Law

Under Brady and its progeny, "[t]he prosecution has a constitutional duty to disclose evidence favorable to an accused when such evidence is material to guilt or punishment." United States v. Coppa, 267 F.3d 132, 135 (2d Cir. 2001). That duty encompasses

both exculpatory materials and information that might be used to impeach a key government witness. Id. (citing Giglio, 405 U.S. at 154). "[A]s a general rule, Brady and its progeny do not require immediate disclosure of all exculpatory and impeachment material upon request by a defendant." Id. at 146; see also United States v. Barret, 824 F. Supp. 2d 419, 455 (E.D.N.Y. 2011) ("It is well-settled that the government need not immediately disclose Brady or Giglio material simply upon request by the defendant." (citing Coppa, 267 F.3d at 146)). Rather, Brady and Giglio material must be disclosed "in time for its effective use at trial." Coppa, 267 F.3d at 144-46; see also United States v. Singletary, 685 F. App'x 33, 34 (2d Cir. 2017) (summary order); United States v. Rodriguez, 496 F.3d 221, 226 (2d Cir. 2007).

B. The Government Has No Obligation to Produce Items Not In Its Possession

As an initial matter, the government affirms that it is aware of and will continue to comply with its Brady obligations throughout the course of this case. The government will continue to attempt to locate relevant materials and at the appropriate time will furnish any subsequent materials discoverable pursuant to 18 U.S.C. § 3500, as well as impeachment materials. See Giglio v. United States, 405 U.S. 150 (1972). As such, the defendants' requests for an order pertaining to the disclosure of Brady material should be denied, consistent with the well-established practice in this district in such circumstances. "Courts of this Circuit have repeatedly denied pretrial requests for discovery orders pursuant to Brady where the [g]overnment has, as here, made a good-faith representation to the Court and defense counsel that it recognizes and will comply with its disclosure obligations under Brady." Shkreli at *2 (citing cases).

With respect to the social media posts that are the subject of Razia's motion, the government does not possess any such materials. The government has no obligation under Brady to provide to defense counsel materials that the prosecution team does not possess. See

United States v. Canniff, 521 F.2d 565, 573 (2d Cir. 1975) ("Clearly the government cannot be required to produce that which it does not control and never possessed or inspected."); United States v. Colello, No. 20-CR-613 (JSR), 2024 WL 3429464, at *2 (S.D.N.Y. July 15, 2024) ("Other circuits have similarly concluded that the Government's Brady obligation covers information only in its possession or control.").[35] With respect to impeachment materials specifically, the Second Circuit has held: "A prosecutor is not constitutionally obligated to obtain information dehors his files for the purpose of discovering information which defense counsel can use in impeaching the credibility of a prosecution witness." Morgan v. Salamack, 735 F.2d 354 (2d Cir. 1984). The government does not possess the requested materials and thus cannot produce them.

[35] Nor does the Government have any obligation to obtain this evidence under Federal Rule of Criminal Procedure 16. The government is required to turn over evidence if it is "within the government's possession, custody, or control" and "the item is material to preparing the defense…the government intends to use it in its case-in-chief at trial…or the item was obtained from or belongs to the defendant." Fed. R. Crim. P. 16(a)(1)(E). The social media and NYPD records Razia seeks meet none of the criteria set forth in Rule 16. The government has no obligation to seek out such materials that are not in the prosecution team's possession. Furthermore, "[t]here is no constructive possession concept or due diligence requirement" that expands the government's responsibility to seek and obtain evidence that hypothetically might exist. United States v. Bradley, 105 F.4th 26, 35 (2d Cir. 2024).

CONCLUSION

For the reasons set forth above, the government respectfully submits that the defendants' motions are without merit and should be denied.

Dated: Brooklyn, New York
July 7, 2025

Respectfully submitted,

JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY

By: /s/
Stephanie Pak
Vincent Chiappini
Assistant United States Attorneys
(718) 254-6064/6299